# EXHIBIT A

*San Miguel Produce, Inc. v. L.G. Herndon Jr. Farms, Inc.*

S.D. Ga. Consolidated Case No. 6:16-cv-00035

<u>EXPERT REPORT OF JOAN C. ROSEN</u>

September 5, 2017

1

I.      QUALIFICATIONS

I earned a bachelor's degree in Food Science from Cornell University and a master's degree in Food Science and Postharvest Physiology from the University of California, Davis. I have worked in the fresh produce and food industry for over 30 years with a focus on food safety for over 24 years.

I previously served as the Director of Global Food Safety and Quality for Chiquita Brands International and Fresh Express. In my 22 years with Fresh Express, I served in various technical management leadership positions with direct responsibility over food safety. Specifically, I ensured standardized food safety and quality systems across fresh produce growing, packing, processing, and distribution operations in North America, Europe, Latin America, and Asia, including compliance with customer, brand, and regulatory standards throughout the supply chain. I also led postharvest research programs at Campbell Soup Company and worked in flavor development and application at Florasynth Inc.

In 2012, I founded JC Rosen Resources, a consulting firm that provides services globally with expertise in food safety, quality systems, postharvest technology, and regulatory affairs for the fresh produce and food industries. My consulting services include, but are not limited to, conducting food safety assessments to help companies prioritize food safety programs and resolve gaps, reviewing sanitation activities, verifying sanitation and environmental monitoring programs, and leading educational workshops.

In addition to my consulting work, I serve on the Technical Committees for the Center for Produce Safety,[1] Produce Marketing Association (PMA) and United Fresh Produce Association (UFPA). The Center for Produce Safety is a collaborative partnership that leverages the combined expertise of industry, government and the scientific and academic communities to focus on providing research needed to continually enhance food safety. As a member of the Technical Committee, I participate in reviewing and recommending research proposals for funding. The goal of the research is to provide information for the industry that is practical, measurable, and translatable. Examples of issues for research include: employee hygiene, wash water sanitation, the use of soil amendments and composting, and management of domestic animals near farms and irrigation sources. As a member of the trade association (PMA and UFPA) technical committees, I have participated in numerous sub-committees and projects to write, review, and edit food safety resource documents for the industry.

I have also completed Lead Instructor Training for Food Safety Preventive Controls Alliance's (FSPCA) Preventive Controls for Human Food, Produce Safety Alliance's Train-the-Trainer Course for the Produce Rule, and FSPCA's Foreign Supplier Verification Programs.

I am a recipient of the International Fresh-Cut Produce Association's Technical Excellence Award for my contributions and achievements in advancing the common good of the fresh-cut industry, enhancing food safety and quality initiatives, and supporting innovative technological advancements.

In 2013, I served as a Subject Matter Expert in a workgroup that developed information on the technical advancements in produce safety since 1998 as it related to "employee hygiene, behavioral practices and food safety training," "equipment design and sanitation (attachment and formation of biofilms)," and "risk reduction and risk mitigation practices post-harvest (sanitizers, temperature management and controlled atmosphere storage and packaging)." This workgroup was coordinated by Deloitte on behalf of the FDA. I was also a Subject Matter Expert for an FDA-contracted project that was

---

[1] *See* http://www.centerforproducesafety.org/.

2

tasked with modeling high risk foods (FDA High Risk Foods Task Order, 2013).  This project was coordinated by the Institute of Food Technologists (IFT) for the FDA.

A copy of my curriculum vitae, including a list of publications I have authored in the last ten years, is attached as Exhibit A.  I have not previously offered trial or deposition testimony.

## II.    ENGAGEMENT

- Provide an overview of food safety practices and standards in the fresh produce industry, including the food safety audit process, Leafy Green Marketing Agreement (LGMA) metrics, and the importance of implementing food safety practices and procedures;

- Provide an overview of standard industry practices for weighing fresh produce;

- Evaluate L.G. Herndon Jr. Farms, Inc.'s ("Herndon") food safety practices and procedures; and

- Evaluate whether Herndon's practices for weighing produce comply with standard industry practices and whether they are reliable and accurate.

In conducting my analysis, I have reviewed San Miguel's complaint; the Grower-Shipper Agreement; San Miguel's notice of termination of the Grower-Shipper Agreement; deposition transcripts of Bo Herndon, Jason Herndon, and Joe Rollins; Herndon's PrimusGFS audits; and various emails related to Herndon's food safety and weighing practices.  I have also reviewed other materials identified through my own independent research as noted in this report, and I have spoken with Jan Berk and Roy Nishimori. I may supplement the conclusions and analysis provided in this report based on further information developed during discovery in this case. I may also prepare demonstrative aids, including summaries or compilations of materials described below, for use at trial.  I am being paid at the rates set out in Exhibit B.

## III.    SUMMARY OF OPINIONS

Based on my review of the materials noted herein, and based on my education, training, and experience in the fresh produce industry, I have reached the following opinions:

- Herndon's food safety practices needed improvement in order to meet best industry practices.  This was evidenced by the following issues:

    (i) Herndon's portable toilets were in unacceptable conditions for the industry;

    (ii) Herndon did not provide appropriate corrective actions in response to third-party ranch audit findings of animal tracks,

    (iii) Herndon provided corrective action audit responses that did not address root causes of identified deficiencies, and

    (iv) Herndon did not provide San Miguel with requested supplier questionnaires and third party audits for outside purchases of product.

3

- The process Herndon uses for weighing harvested greens is atypical for the produce industry, internally inconsistent, and is not designed for providing accurate pallet weights. I have never seen other produce operations use the weighing practice that Herndon uses.

IV.     **ANALYSIS**

   A.   **Food Safety**

        1.   Overview of Food Safety and Food Safety Audits

   Food safety focuses on reducing the risk of biological, chemical and physical hazards to protect public health. With respect to biological hazards (*e.g.*, pathogenic bacteria, viruses, and parasites) fresh produce presents unique challenges in food safety because there is no "kill step" for the product. For example, while canned vegetables will undergo a designated thermal process that has been shown to inactivate pathogens of concern, fresh vegetables do not go through that process. Therefore, in my experience, there is great emphasis in the fresh produce industry on prevention of contamination at all points in the supply chain, historically through Good Agricultural Practices, Good Manufacturing Practices, and Hazard Analysis and Control Points (HACCP).

   In 1998, the U.S. Food and Drug Administration (FDA) issued its "Guide to Minimize Microbial Food Safety Hazards for Fresh Fruits and Vegetables."[2] These practices, along with other standard industry publications, make up the Good Agricultural Practices (GAPs) that prudent growers follow. In addition, industry groups have developed various commodity-specific guidance documents since 1998 to convey best practices in the industry to minimize microbial food safety hazards. An example is the Commodity Specific Food Safety Guidelines for the Lettuce and Leafy Greens Supply Chain.[3]

   At the field level, food safety focuses on the topics of greatest risk for contributing to produce contamination. These risks are typically referred to as the "4Ws": Workers, Wildlife, Water, Waste.[4] It is standard industry practice for growers to implement food safety practices aimed at preventing contamination through the 4Ws.[5]

   In 2011, the Food Safety Modernization Act (FSMA) became federal law.[6] Its aim is to shift the focus of federal regulators from responding to contamination to preventing contamination.[7] To implement that change, the FDA has issued final rules that address fresh produce growing, harvesting, cooling, and packing activities, as well as manufacturing food safety standards. For example, the Produce Rule: Standards for the Growing, Harvesting, Packing, and Holding of Produce for Human Consumption was published in 2015.[8]

   Food safety audits have traditionally been used throughout the industry to assess compliance with a defined set of food safety standards. Audits can be first-party (a self-audit), second-party (performed by a customer) and/or third-party (performed by an independent agent). In my experience,

---

[2] *See* https://www.fda.gov/downloads/Food/GuidanceRegulation/UCM169112.pdf.

[3] *See* https://www.fda.gov/Food/GuidanceRegulation/GuidanceDocumentsRegulatoryInformation/ProducePlantProducts/ucm168630.htm.

[4] *See* https://www.fda.gov/ohrms/dockets/dockets/07n0051/07n-0051-ts00005-cassens.pdf, at slide 21.

[5] *Id.*

[6] *See* https://www.fda.gov/Food/GuidanceRegulation/FSMA/ucm247546.htm.

[7] *Id.*

[8] *See* https://www.federalregister.gov/documents/2015/11/27/2015-28159/standards-for-the-growing-harvesting-packing-and-holding-of-produce-for-human-consumption.

industry players have experienced "audit-fatigue" over time as a result of suppliers undergoing multiple and duplicate audits conducted against varying in-house standards and on behalf of various customers and buyers.

In part to combat that problem, the Global Food Safety Initiative (GFSI) was established in 2000.[9] Specifically, GFSI, an industry-driven global collaboration, is designed to reduce food safety risks, audit duplication, and costs while building trust throughout the supply chain.[10] GFSI uses a benchmarking model to determine equivalency between food safety certification programs, while leaving flexibility and choice in the marketplace.[11]

A food safety certification program and audit scheme recognized by GFSI and commonly used in the fresh produce industry is PrimusGFS.[12] PrimusGFS audits are performed by Certification Bodies (auditing companies) that are approved by the PrimusGFS Scheme and accredited under ISO 65 or equivalent standard to perform PrimusGFS audits.[13]

In order to achieve certification to the PrimusGFS standard, a company submits an application and requests an audit.[14] After the audit is conducted, the auditor has 10 calendar days to submit the preliminary results. In response, the company has the option to submit corrective actions addressing specific deficiencies in the auditor's findings within 30 calendar days from the date of the audit. The auditor then has 15 calendar days to review submitted corrective actions and accept or reject them. The preliminary score will be recalculated based upon the outcome of the corrective actions review. If the final audit score average is at least 90% and 85% in each module, the client will receive a PrimusGFS certificate.

In my opinion, audited companies may sometimes focus too much on the final passing audit score which can show, for example, 95%, but still have important food safety issues to resolve and address. In order to follow best food safety practices, it is my opinion that it is critical for a company to read the auditor's comments and the identified non-compliances and not simply rely on a passing score. In my experience in the fresh produce industry, a company may even outsource review of third-party audits as an extra level of oversight to address the importance of thoroughly reading and assessing non-compliances as well as corrective actions. These companies, as well as a buyer, may request additional and/or different corrective actions in the event that they find issues of greater concern and/or responses that are inadequate or incomplete.

In my experience, while it is up to the audited company to determine if they want to respond with a corrective action, it is best practices and the industry standard for companies to respond to non-compliances by clarifying possible miscommunications that occurred during the audit and/or describing their relevant corrective actions. In my experience, corrective actions should be specific, include timelines and responsibilities, and adequately address and resolve the non-compliance issue. Formulating the corrective actions typically also includes investigation into the root cause of the issue so that it will not re-occur. For example, if a field worker puts their harvesting knife in the soil during a break, the corrective action might include steps for re-training so that they discontinue the practice. However, the investigation should also be asking the question 'why did this occur?' and the preventive

[9] *See* http://www.mygfsi.com/; http://www.mygfsi.com/about-us/about-gfsi/what-is-gfsi.html.
[10] *Id.*
[11] *See* http://www.mygfsi.com/certification/recognised-certification-programmes.html.
[12] *See* http://www.primusgfs.com/; http://www.primusauditingops.com/index.php/scheme-menu-primusgfs.
[13] *Id.*
[14] *See* http://www.primuslabs.com/services/PrimusGFS%20certification%20Process.pdf.

action (as part of a corrective action response), might be that a designated container with sanitizer solution needs to be available close to the worker.

2.   Overview of LGMA Metrics

The California Leafy Green Marketing Agreement (LGMA) was started in 2007 after the *E. coli* O157:H7/spinach outbreak.[15]  The goal of LGMA food safety practices is to protect public health by reducing potential sources of contamination and by establishing a culture of food safety on farms.  The LGMA operates with oversight from the California Department of Food and Agriculture (CDFA) and is a mechanism for verifying through mandatory government audits that farmers follow accepted food safety practices for various leafy greens.  The LGMA's science-based food safety practices were developed by a cross-functional team of experts, and the practices evolve as new information becomes available.  LGMA auditors are highly trained, employed by the CDFA, and licensed by the U.S. Department of Agriculture.

The vast majority of California leafy green handlers are members of LGMA.[16]  There is also an Arizona LGMA since the majority of leafy greens growing operations transfer to Arizona in the winter. Each member company is subject to mandatory government audits. Every leafy greens farm that supplies product to an LGMA member is audited at least once per year.  If an LGMA member is found to be out of compliance in any of these areas, that company is issued a citation (four levels, ranging from a Minor Infraction to a Flagrant Violation.)  The LGMA Compliance Audit Process provides opportunities for member companies to take corrective action on citations that do not pose an immediate threat to food safety and public health.   Completion of corrective and preventative action is verified upon subsequent mandatory re-inspection by government auditors.  Flagrant Violations, which could result in a potentially unsafe product reaching the marketplace, result in decertification from the program and discontinued use of the LGMA Service Mark.

In my opinion, it is a reasonable and good practice to follow LGMA metrics given that the food safety practices were developed by a collaborative group of experts, the practices evolve as driven by new research and learnings, and the auditing is conducted by trained government employees.  The LGMA metrics are available here: http://www.lgma.ca.gov/wp-content/uploads/2014/09/California-LGMA-metrics-01-29-16-Final1.pdf.

3.   Herndon Had an Obligation to Operate Using Best Industry Practices

Under the terms of the Grower-Shipper Agreement, Herndon agreed to operate "in accordance with best industry standards and practices" and to "implement and farm GAPs following the California Leafy Greens Marketing Agreement (LGMA) metrics and protocols."[17]  In my experience, those contractual terms comply with good industry practices. Given the history of food safety issues related to leafy greens, it is my opinion that it was appropriate and prudent for San Miguel to focus on ensuring that Herndon was complying with not only the PrimusGFS standards, but the LGMA standards as well. In my experience, successfully completing a PrimusGFS audit, or other relevant GFSI scheme audit is considered a 'minimum entry' for a grower to do business with fresh-cut processors and/or retail or foodservice customers.

---

[15] *See* http://www.lgma.ca.gov/.
[16] *See* http://www.lgma.ca.gov/food-safety-program/certified-members/.
[17] Grower-Shipper Agreement, ¶ 2(c), (g).

I understand that, on numerous occasions, San Miguel tried to help Herndon improve its food safety program by providing templates and examples of various food safety-related documents and forms that San Miguel used for Standard Operating Procedures (SOPs), Good Manufacturing Practices (GMPs), GAPs, a PrimusGFS checklist, and examples of San Miguel's corrective actions.  In addition, San Miguel's food safety team members made numerous visits to Herndon to provide support for food safety improvements. Based on that information and discussions with Jan Berk and Roy Nishimori, it is my opinion that San Miguel undertook reasonable efforts to assist Herndon and to ensure that Herndon was operating in compliance with best industry standards.  Indeed, Jason Herndon testified in his deposition that San Miguel was helpful to Herndon in improving Herndon's food safety practices.[18]

4.  <u>Herndon Had Shortcomings in Its Food Safety Practices</u>

Based on my review of the materials noted herein, conversations with Jan and Roy, and my experience, I have concluded that there were food safety concerns at Herndon with respect to implementation of and compliance with their own policies or food safety programs, the ability to provide clear and appropriate corrective actions in response to audit findings, and the ability to determine appropriate preventive actions to food safety issues.  As prevention of contamination is the core of food safety, it is essential that the root cause of an issue is identified to prevent recurrence.  I discuss below some examples of these issues, which could raise legitimate concerns with business partners in the industry.

a.  *Observations of Herndon's Food Safety Issues*

I understand that San Miguel employees personally observed certain food safety problems on site at Herndon that, in my opinion, conflict with fundamental Good Agricultural Practices.  For example, there were several circumstances noted during an October 2015 visit by San Miguel's field manager that I consider egregious food safety violations.  These observations included (i) dirty portable toilets without toilet paper or proper signage, (ii) portable toilets with no storage for the toilet paper (toilet paper roll in the urinal), (iii) handwashing water that was not contained and was running into the field, (iv) a lack of trash container in the fields, and (v) crew members urinating in the field.

In my opinion, these are serious hygiene issues that are unacceptable in even a basic food safety program, and these issues would typically be grounds for discontinuing use of a supplier.  In my experience, these practices could lead to the spread of bacterial pathogens and result in product contamination, a recall, and/or foodborne illness outbreak.  Additionally, it is my opinion that these conditions discourage workers from using the portable toilets.  While workers may be well-trained, the conditions of the portable toilets could dissuade the workers from using them, causing workers to resort to relieving themselves adjacent to a field.  In my experience, any worker who urinates in a field is terminated, and the instance would be followed with extensive re-training of the crew and supervisors, who might also be subject to disciplinary actions, as well as a thorough investigation into the root cause of the problem.  In short, it is my opinion that these practices or even one-off circumstances are unacceptable and do not comply with standard industry practices.

b.  *Audits and Corrective Actions*

It is also my opinion that Herndon's food safety audits and responses to those audits reveal concerns with Herndon's food safety program.  I have reviewed the PrimusGFS audit files that were completed for Herndon's Ranches, Harvesting Crews and Cooler, as well as the Corrective Action reports

---

[18] *See* Jason Herndon Depo. Tr. at 117:21-118:8.

7

from the November 4, 2015 Ranch and Harvesting Crew audits and the February 4, 2015 Cooler/Cold storage audit. While Herndon passed its PrimusGFS audits and many of the corrective actions were accepted by the auditor, there were multiple times when Herndon did not respond appropriately or completely as a follow up to the audit. As I explain above, it is my opinion that responding to identified issues with appropriate corrective actions is important to ensure effective and sustainable food safety practices. In addition, it is my opinion that Herndon did not delve into the preventive steps, so its corrective action responses could be more of a band-aid rather than a long-term solution that would prevent recurrence of the issue. Below I provide examples of non-compliance issues identified in the PrimusGFS audits, the risks and hazards associated with these problems, and Herndon's lack of a full response to address the issues identified. These examples are not exhaustive.

### Sanitation Verification and Listeria Risk

The cooling/cold storage audits conducted on Feb. 5, 2016 and Feb. 4, 2015 noted that there was no routine program and written procedure to validate sanitation effectiveness using rapid post-sanitation checks (e.g., ATP measurements). These were rated as non-compliances with comments about the company not conducting any rapid post-sanitation checks such as ATP bioluminescence. In my experience, food safety programs often include rapid ATP bioluminescence testing as well as microbial testing to verify sanitation effectiveness.

If sanitation is not executed properly, the pathogen *Listeria monocytogenes* may grow in a cold, wet environment. This pathogen has serious health consequences, including death. An estimated 260 people die annually from a *Listeria* infection.[19] Listeriosis is a serious foodborne illness with a high mortality rate.[20] Notable *Listeria* outbreaks over the past few years have been linked to Blue Bell ice cream in 2015 (10 hospitalizations; 3 deaths),[21] Dole packaged salads in 2016 (19 hospitalizations; 1 death),[22] and Vulto Creamery Soft Raw Milk Cheese in 2017 (8 hospitalizations; 2 deaths).[23]

Herndon's corrective action comments note that Herndon does not have an ATP program in place to verify sanitation effectiveness and that instead, its micro-sampling program has been validating its sanitation procedures so far. Herndon also notes that its food safety committee would continue to discuss the issue and will put a program in place in the future if necessary. This corrective action was rejected by the auditor. General microbial testing for sanitation verification would typically focus on aerobic plate counts (APC). Based upon my review of their micro sampling procedure it appears that Herndon's focus is on Salmonella, which is typically an environmental pathogen of concern in dry environments, while *Listeria* is an environmental pathogen of concern in wet, cold environments.

In addition, Herndon's cold storage room had standing water, which creates a type of environment where *Listeria* can thrive and spread. Herndon's February 5, 2015 audit states:

2.24.06 – Are floor surfaces in good condition, with no standing water, no debris trapping cracks and are they easy to clean? Major deficiency – There was water observed accumulating in the corners of the cold storage room and there was damaged concrete bumpers in the storage

---

[19] *See* https://www.cdc.gov/listeria/index.html.
[20] *See* https://www.fda.gov/downloads/Food/FoodborneIllnessContaminants/UCM297627.pdf.
[21] *See* https://www.cdc.gov/listeria/outbreaks/ice-cream-03-15/index.html.
[22] *See* https://www.cdc.gov/listeria/outbreaks/bagged-salads-01-16/index.html.
[23] *See* https://www.cdc.gov/listeria/outbreaks/soft-cheese-03-17/index.html.

rooms.  There was aggregate exposed and cracks in the floor surface throughout the cooling/cold storage.

Once established in the floor, *Listeria* can transfer to product through splashing, forklift and pallet jack traffic, and worker traffic.  In my experience, prudent food safety practices would include developing a plan to repair the floor surface and bumpers, as well as determining the reason why water is accumulating in the corners of the floor and fixing the issue.  Additional *Listeria* species swabbing could be done in these areas for risk assessment and to ensure traffic patterns are adjusted (including short term adjustments until floors are repaired) in the event that there are positive tests for *Listeria*.

But Herndon's corrective action comment was that there was little it could do about the cracked concrete, but that it was amending its micro-sampling plan to include floors and locating any issues and addressing them.  The auditor adjusted this non-compliance to a minor deficiency; however, it appeared that the micro-sampling is for Salmonella, not *Listeria*.  Salmonella testing will not provide information about the presence of *Listeria*.

### *Food Safety Responsibility*

It is my opinion that Herndon's audits also show inconsistencies in the company's food safety responsibilities.  For example, in the December 2014 Ranch audits, Jason Herndon is designated as the person responsible for food safety programs for field operations (question 2.01.0).  That audit also notes that Bo Herndon and Jason Herndon are the only people that can revise or update documents related to the food safety program (question 1.02.01).  Both Jason and Bo Herndon testified, however, that Zinna Alvarez has ultimate responsibility for food safety.[24]

### *Employee Hygiene*

In the November 4, 2015 ranch audit, the auditor noted that there were no paper towels at the handwash station in response to Question 2.10.08 ("Are hand wash stations properly stocked with soap, paper towels and trash can?").  Herndon's corrective action states that the station was fully stocked and a photo was provided.  In my experience, however, companies typically provide an explanation of why the non-compliance issue occurred and provide a plan for moving forward.  Herndon's corrective action does not address why there were no paper towels.  In my experience, if the 'why' is not addressed, it is likely that the issue will recur.

### *Field Risk Assessment*

In the November 2015 audit, there were two audit notations for section 2.03.07 about risk assessments not having been undertaken for the growing area with appropriate corrective actions to minimize identified hazards where necessary.   Observations were for (1) an adjacent field of soybeans and (2) an adjacent field of pecan trees that had no risk assessment for chemical/spray drift to the growing area.

In my experience, the purpose of the pre-planting risk assessment is to determine any potential biological, chemical, and/or physical risks to the leafy green growing area.  It is essential that these

---

[24] Jason Herndon Depo. Tr. at 46:4-6 (Q: "So for food safety, the buck sort of stops at Zinnia?"  A:  "Correct."); Bo Herndon Depo. Tr. at 10:5-7 (Q: "What about food safety at Herndon during the Robo time? Who handled food safety there?"  A: "Zinnia."); 11:14-15 ("I'm no food safety person."); 42:12-13 ("I didn't have nothing to do with the food safety.").

assessments are completed prior to planting so that the risk can be mitigated and potential food safety issues avoided.

In both situations identified in Herndon's November 2015 audit, Herndon's submitted corrective action was that the risk assessment was completed, but these assessments were performed *after* the audit. The document provided to the auditor shows a change in the response to Question #19 ("Are there any other potential food safety risk issues associated with adjacent land uses?") from 'N' to 'Y' along with notes regarding how the risk was being managed. This corrective action does not resolve the question of why this safety risk was not identified and documented during the risk assessment prior to planting the leafy green field.

### *Use of Non-Composted Chicken Litter*

The organic ranch audit performed on December 9, 2014 noted that chicken litter was applied to the production area in response to Question 2.07.04. The auditor noted that "[t]he chicken litter was applied and incorporated into the soil on July 1, 2014. There has been no harvest of the field to date. The company has a certificate of analysis on file for the chicken litter. There are no regulations prohibiting the use of chicken litter (untreated animal manure) in the state of Georgia. The company does not participate in the California LGMA."

While applying non-composted chicken litter does not constitute a non-compliance in the organic audit, the practice is specifically prohibited by LGMA metrics. The metrics state, "DO NOT USE raw manure or soil amendment that contain un-composted, incompletely composted animal manure and/or green waste or non-thermally treated animal manure to fields which will be used for lettuce and leafy green production."[25] In my experience, uncomposted animal manure, such as chicken litter, can be a source of pathogens.

### *Animal Tracks*

Many of Herndon's ranch and harvesting crew audits cited animal tracks (evidence of deer and animal tracks, or evidence of turkey tracks) in the growing area as a non-compliance issue.[26] While leafy greens are grown outdoors and it is possible to have wildlife intrusion or activity, there was no documentation whatsoever provided by Herndon about how it either took steps to prevent animal activity and intrusion (for example, fencing or avoidance of using certain fields), nor was there any documentation about limiting the harvest near these areas to minimize risk. In my experience, the pre-harvest audit conducted by prudent companies' field food safety programs ensure that areas affected by animal intrusion are identified and the harvest is modified to ensure that these areas are buffered and not harvested. In my experience, animal activity in a leafy green field may cause pathogen transference to the product resulting in product contamination, recalls, and/or foodborne illness outbreaks. Animal activity in the field (and evidence of that animal activity) was a significant factor in the *E. coli* O157:H7 outbreak associated with spinach in 2006.[27]

Herndon's corrective action comment was that it is impossible to have no animal presence and/or activity. This corrective action was accepted, but in my opinion, a more appropriate response to

---

[25] *See* http://www.lgma.ca.gov/wp-content/uploads/2014/09/California-LGMA-metrics-01-29-16-Final1.pdf , at 23.
[26] *See, e.g.*, Nov. 4, 2015 Harvest Crew audit, Santiago Diaz/Rollins (2.13.01: Deer tracks were present in the growing area); Nov. 4, 2015 Ranch audits for Clifton, Frost, and Rollins (2.03.04: Deer tracks present around the growing area); Nov. 4, 2015 Ranch audit for Alexander (Turkey tracks present around the growing area).
[27] *See* https://www.fda.gov/ohrms/dockets/dockets/07n0051/07n-0051-ts00005-cassens.pdf, at slide 20.

minimize risk would have been to further evaluate the surrounding areas during pre-planting assessments and choose to avoid certain areas, install fences around areas of greater risk, and/or ensure that growing and pre-harvest assessments thoroughly reviewed these areas with buffering and/or prohibiting of fields as appropriate.

The auditor noted that pre-harvest inspections were being done within a week of harvest for the blocks (Question 2.11), but it is not clear why the pre-harvest inspections did not find any issues, even while the auditor observed animal tracks:

> Question 2.11.02a – Where pre-harvest inspections have discovered issues, have buffer zones been clearly identified and at the time of the audit, are these buffer zones being respected?  The auditor rated this as N/A "There were no issues discovered during the pre-harvest inspection."

> Question 1.05.03 – Is there a documented product release procedure available?  This was rated as Total Compliance with a note of "There have been no areas of the growing operation or products at the facility that have been placed on-hold or rejected during the past year."

Given the numerous observations of animal tracks by the auditors, and given Herndon's statement that it is impossible to have no animal presence or activity in its fields, it is my opinion that animal intrusion issues should have been identified in the pre-harvest audits, and treated with appropriate growing area buffering or rejection.

### c.   Mock Recall

It is my opinion that the mock recall initiated by San Miguel in December 2015 was more extensive than the traceback/traceforward exercises that are noted in the audits.  The audits report completion within two hours, although there is no information on the accuracy of the data (*e.g.*, does the amount of product harvested correlate to the amount of product shipped and customer list?). During a real recall, it is typical to capture the source and quantity of raw product, amount of product processed and shipped, and a customer list, and it is also necessary to gather relevant records that might provide insight on food safety risks and controls.  Therefore, in my opinion, San Miguel's requests of Herndon to report on water testing, hydrocooling sanitizer treatment results, quantities harvested for the three lots, quantities and lots processed, and customers who would have received those lots was appropriate to simulate a real recall situation.

Herndon did not meet the two-hour requirement for the mock recall, and it was also identified that the hydrocooler records did not identify the date/time for cooling the lots in question.   This practice was adjusted as part of the corrective action.

### d.   Third-Party Purchases

When purchasing raw product from third party growers, I understand that San Miguel's policy is to have the grower complete a Supplier Food Safety Questionnaire and provide a copy of their third-party food safety audit.  San Miguel then reviews the documents and determines if they are acceptable.

In my experience, San Miguel's practice of requiring a completed questionnaire and reviewing a third-party audit is typical in the industry and follows best practices that are designed to minimize food safety risk.

I understand that there were occasions when San Miguel was not notified about outside purchases of product that Herndon sold to San Miguel. It is my opinion that if the outside purchases are not communicated to San Miguel in advance, allowing time for food safety documentation review, it prevents San Miguel from following its own policy and creates potential food safety risks if the grower did not have adequate controls in place.

    **B.   Weighing Produce**

        1.   <u>Overview of Standard Weighing Practices in Fresh Produce Industry</u>

In my experience, harvested product used in the fresh-cut industry is typically weighed on either a truck scale or a pallet scale. Typically, when a pallet scale is used, the full pallet with totes containing the produce is weighed together at once, and then the weight of the pallet and the totes is subtracted from the total weight. Also in my experience, when a pallet scale is used, each individual pallet is weighed and recorded, often on a pallet tag. It is my opinion that this weighing practice is the industry standard when pallet weights are used, and that the measurements ensure that the grower is properly compensated for the crop.

        2.   <u>Herndon's Weighing Practices Were Not Accurate or Reliable</u>

I understand that Herndon's alleged weighing procedure is to weigh a sample of totes from a pallet and then average out the samples to obtain the average weight of the whole pallet.[28] Joe Rollins, Herndon's packing shed manager, testified that employees weigh a sample of totes from a pallet and bring him a handwritten note listing the individual tote weights calculated to the tenth of a pound.[29] Mr. Rollins testified multiple times that he then adds up the sample tote weights, deducts the weight of the actual totes, averages out the weight to the full pallet, and rounds to the nearest tenth of a pound to determine the total average pallet weight.[30] Mr. Rollins later testified, however, that he rounds to the nearest whole number at the last stage of the calculation.[31]

As an initial matter, in my over twenty years of experience in this industry, I am not aware of anyone else in the produce industry that uses Herndon's practice of weighing a sample of totes to determine the total weight of a pallet. Moreover, my review of materials provided shows that Herndon's actual weighing practices were unclear and inconsistent. Bo Herndon initially stated in an email to Roy Nishimori that Herndon weighed 2-3 totes per pallet.[32] But Bo Herndon testified in his deposition, as did Jason Herndon, that they instructed their employees to weigh 3-5 totes per pallet.[33] Mr. Rollins initially testified that employees weighed 3-5 totes per pallet, but he subsequently stated that "5 is what I want…. 5 was the rule. If you didn't do 5, I was going to let you know about it, but 5 is what I wanted. 5 was the normal number."[34]

In my opinion and experience, these inconsistent statements show that Herndon did not have a clear weighing practice. It is also my opinion that any of Herndon's practices (as described by Bo Herndon, Jason Herndon, or Mr. Rollins) is not an accurate method to determine the actual weight of

---

[28] SanMiguel001678; SanMiguel001664.
[29] Joe Rollins Depo. Tr. at 15:25-16:13; 23:6-8.
[30] Joe Rollins Depo. Tr. at 16:18-17:10; 23:2-5; 31:25-32:4; 38:10-15.
[31] Joe Rollins Depo. Tr. at 47:5-16.
[32] SanMiguel001678.
[33] Bo Herndon Depo. Tr. at 43:13-44:17; Jason Herndon Depo. Tr. at 77:18-78:9.
[34] Joe Rollins Depo. Tr. at 23:2-24:16.

the product, given naturally occurring tote-to-tote variability in product weights resulting from varying field conditions, different harvesters, product maturity, and other factors.

Submitted this 5th day of September, 2017.

/s/ Joan C. Rosen
Joan C. Rosen

# EXHIBIT A

# Joan Rosen

jrosen121@gmail.com
Pacific Grove, CA  93950

831-594-5550 (c)
831-649-8160 (o)

## SUMMARY OF QUALIFICATIONS

Thirty+ years experience with expert knowledge in food safety, quality systems, technical services and regulatory management.  Highly effective strategic leadership and organizational development skills.  Experienced in domestic and international business climates.

## WORK HISTORY

| JC Rosen Resources, Pacific Grove, CA | 2012 – Present |
|---|---|

Fresh produce and food industry consulting services providing leadership in quality and food safety systems, postharvest technology, regulatory affairs, business development and issue management.  Partner with clients throughout the supply chain to identify and prioritize opportunities, resolve issues and drive continuous improvement.

| Chiquita Brands International/Fresh Express Incorporated, Salinas, CA | 1990 – 2012 |
|---|---|
| Global Director of Food Safety and Quality | 2011 - 2012 |
| Global Director of Food Safety | 2007 - 2011 |
| Director of National Food Safety & Regulatory Affairs | 1997 - 2007 |
| Director of National Quality and Technical Services | 1993 - 1997 |
| Technical Services Manager | 1990 - 1993 |

Increasing responsibilities in key management leadership positions during rapid growth of company.  Global role ensuring consistent policies and standards world-wide, including compliance with customer, brand and regulatory standards throughout the supply chain.

♦   Corporate Leadership Team member, responsible for $30MM budget, 7 direct reports (global) and 300 employees at 6 processing facilities.  International assignment at European headquarters included establishment of quality system, joint venture standardization and implementation of crisis & issue management program for European division.  Developed strategy and led implementation of quality and food safety system for joint venture in China. Aligned policies with Tropics team.  Responsible for domestic and international regulatory affairs.   Represented company in customers' global food safety and quality councils.

♦   Provided strategy and had oversight of team responsible for implementation of a globally recognized Food Safety Certification, FSSC 22000 in North America plants.  Led cross-functional team to drive customer rejections down by 70% in 6 months.  Directed transition of quality staff duties with resulting $2.5 MM cost reduction.  Standardized HACCP programs across three companies after business acquisitions.

♦   Developed teams and strategy for quality systems building from a single operation to an international business during rapid growth of fresh-cut packaged salad, fruit and vegetable industry.  Led design of streamlined approval and management process for global suppliers, licensees and co-packers - included numerous categories of consumer-packaged goods such as cheese, baked condiments, dressings and sauces, smoothies, juices and cooked meats.  Led standardization of food safety criteria and audit standards for global procurement of ingredients.

♦   Developed personnel and led team's accomplishments to be recognized by external stakeholders.  Led development of corporate quality and food safety metrics and KPIs for company-owned facilities, co-manufacturers, joint venture partners, licensees and suppliers including customer/consumer reporting systems.  Implemented educational programs on key technical and product quality attributes for suppliers, customers, associates, management and sales organization.

Joan Rosen                                                                                          Page 2 of 4

| Campbell Soup Company, Vegetable Research Department, Camden, NJ | 1987 - 1990 |
|---|---|
| Senior Research Associate | 1989 – 1990 |
| Research Associate | 1988 - 1989 |
| Senior Research Assistant | 1987 - 1988 |

Postharvest research, technical support and quality role for branded produce category in Campbell's Fresh division. Enhanced whole and cut fresh produce shelf life and quality through improvements in varieties, postharvest handling, cold chain management and modified atmosphere technology.

| Florasynth, Inc., New York, NY | 1982 - 1985 |
|---|---|
| Food Technologist, Flavor Applications | 1983 – 1985 |
| Flavor Chemist Trainee, Flavor Development | 1982 - 1983 |

## EDUCATION

Master of Science, Food Science & Postharvest Physiology, University of California - Davis, Advisor – Dr. Adel Kader

Bachelor of Science, Food Science, Cornell University

## AWARDS AND PUBLICATIONS

♦ Co-author for Gombas et al., 2017, Guidelines to Validate Control of Cross-Contamination During Washing of Fresh-Cut Leafy Vegetables, J. Food Prot. Vol. 80, No. 2
♦ Food Safety Magazine, April/May 2013. A Disciplined and Unique Focus by Chiquita Brands Reduces Early Supply Chain Risk
♦ Black Pearl award, Chiquita Brands International
♦ International Fresh-Cut Produce Association Technical Award
♦ Rosen, J.C. and Kader, A.A. (1989), Postharvest physiology and quality maintenance of sliced pear and strawberry fruits. J. Food Science, 54 (3): 656 - 659.

## CERTIFICATION AND TRAINING

♦ FSMA Preventive Controls Qualified Individual Lead Trainer, FSMA Produce Rule Trainer, Certified ASQ HACCP Auditor
♦ Process improvement and leadership: Continuous Improvement 1, 2, 3 method, DOE, Conway and SPC training, Creative Problem Solving, Zenger Miller Leadership 2000 skills
♦ Quality and Food Safety: FDA On-Farm Safety and Traceback, HACCP training, Microbial Risk Assessment, Mock Crisis workshops

## ACTIVITIES

♦ Center for Produce Safety, Produce Marketing Association and United Fresh Produce Association – Technical Committees
♦ Grocery Manufacturers Association – Co-chair, Food Safety Modernization Act Working Group
♦ Contributor and editor of industry-wide Melon and Lettuce/Leafy Greens Commodity Guidances
♦ Institute of Food Technologists – FDA-sponsored expert panel on Whole and Fresh-Cut Produce
♦ International Fresh-cut Produce Association - Technical Committee: Contributing author and editor of technical publications, Team leader and Editor-in-Chief for Allergen Management Manual
♦ Food Products Association – Chairperson of Cut and Packaged Fresh Produce Committee, Refrigerated Foods Labeling Task Force member and co-author of publication on fresh-cut produce

## PRESENTATIONS

♦ Global Food Safety Initiative: Reducing Risk Early in the Supply Chain
♦ UC Davis, Fresh-Cut Produce Course Instructor: Fresh-Cut Product Quality
♦ European Fresh-Cut Short Course, Almeria, Spain: Food Safety and Quality
♦ University of Foggia, Italy: Researchers meet Industry
♦ GMA/FPA: Industry Perspective - Produce Food Safety
♦ PackExpo: Sanitary Design Principles for Fresh-Cut Produce

Joan Rosen

- IFT: Building a food safety system and Keeping fresh-cut produce safe
- USDA:  Value-added produce for tropical island economies: Fresh-cut fruits and vegetables

## PUBLICATIONS

- D. Gombas, Y. Luo, J. Brennan, G. Shergill, R. Petran, R. Walsh, H. Hau, K. Khurana,B. Zomorodi, J. Rosen, R. Varley, and K. Deng.  2017, *Guidelines to Validate Control of Cross-Contamination During Washing of Fresh-Cut Leafy Vegetables*, J. Food Prot. Vol. 80, No. 2, *available at* http://jfoodprotection.org/doi/pdf/10.4315/0362-028X.JFP-16-258?code=fopr-site.
- Rosen, J.C., *A Disciplined and Unique Focus by Chiquita Brands Reduces Early Supply Chain Risk*, Food Safety Magazine, April/May 2013.
- Rosen, J.C. and Kader, A.A., *Postharvest physiology and quality maintenance of sliced pear and strawberry fruits*, J. Food Science, 54 (3): 656-59 (1989).

Joan Rosen



Contact:  Joan Rosen, jrosen121@gmail.com
+1 831-649-8160 (o), +1 831-594-5550 (c)
Skype:  joan.rosen135

## Consulting Services

- ❖ Food Safety/Quality System Reviews and Assessments
  - o  Complete Supply Chain (Field Level through Production/Distribution and End-User)
  - o  Evaluation of Current Practices/Prioritized Recommendations
  - o  Supplier Management Programs
  - o  Preventive Controls/HACCP/GMP/GAP
  - o  Organizational Design and Development

- ❖ Foodborne Pathogen Control
  - o  Reviews and Assessments
  - o  Trouble Shooting
  - o  Issue Resolution

- ❖ Regulatory Affairs
  - o  Updates and Reviews, including FSMA
  - o  Compliance

- ❖ Food Safety and Quality Projects
  - o  Project Management
  - o  Resource and Specialist
  - o  Subject Matter Expert

- ❖ Training and Educational Workshops and Webinars

- ❖ Postharvest Technology
  - o  Reviews and Assessments
  - o  Project Management

- ❖ Cold Chain Management

- ❖ Traceability and Recall/Issue Management

- ❖ Technical Marketing Collateral Development

- ❖ Other Services Customized to Client Needs

EXHIBIT B

**Fee Schedule for Expert Witness and Litigation Services**
**2017**

Consultation
     Hourly (billed in 30 minute increments)................................................................$325.00
     Daily (activity exceeds 5 hours)................................................................$3,500.00

Document Review
     Hourly (billed in 30 minute increments)................................................................$300.00

Information Search, Analysis, and Document Preparation
     Hourly (billed in 30 minute increments)................................................................$350.00

Travel
     All reasonable direct expenses and lodging reimbursed
     Driving or air travel time (from home office to destination site) per hour ............$150.00

Deposition
     Required 3-hour baseline................................................................$3,500.00
     Additional hourly (30-minute increments)................................................................$800.00

Expert Testimony (per court date; on stand or on-site)........................................$4,000.00

**Payment Obligations:**  Payment is required within 30 days of receipt of monthly invoice.

§ 9-12-82.

As against bona fide purchasers for value without actual notice of a judgment or other third parties acting in good faith and without notice who have acquired a transfer or lien binding the defendant's property, no money judgment obtained in any court of this state or federal court in this state outside the county of the defendant's residence shall create a lien upon the property of the defendant located in any county other than that where obtained unless the execution issuing thereon is entered upon the general execution docket of the county of the defendant's residence within 30 days from the date of the judgment. When the execution is entered upon the docket after the 30 days, the lien shall date from such entry.

HISTORY: Laws 1822, Cobb's 1851 Digest, p. 497; Ga. L. 1851-52, p. 238, § 1; Code 1863, § 3502; Code 1868, § 3525; Code 1873, § 3583; Ga. L. 1878-79, p. 143, § 2; Code 1882, § 3583; Ga. L. 1889, p. 1006, § 3; Civil Code 1895, §§ 2780, 5356; Civil Code 1910, §§ 3322, 5951; Code 1933, §§ 39-702, 110-512.

## Annotations

1 to 1 of 1 results ⋅ Authority Check
Case Decision Date        Entire Database

1. Tunnelite, Inc. v. Estate of Sims, 266 Ga.App. 476, 597 S.E.2d 555 (Ga.        March 24,        6
   App., 2004)                                                                    2004
   6. OCGA §§ 9-12-86(b); 9-12-81(b);...