# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF GEORGIA
# STATESBORO DIVISION

| | |
|---|---|
| SAN MIGUEL PRODUCE, INC., | |
| Plaintiff, | CIVIL ACTION NO.: 6:16-cv-35 |
| v. | |
| L.G. HERNDON JR. FARMS, INC., | |
| Defendant. | |

## **O R D E R**

CERTIFICATION OF QUESTIONS FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF GEORGIA TO THE SUPREME COURT OF GEORGIA PURSUANT TO O.C.G.A. § 15-2-9.

TO THE SUPREME COURT OF GEORGIA AND ITS HONORABLE JUSTICES:

The above-captioned matter comes before this Court on Plaintiff and Defendants' respective Motions for Partial Summary Judgment. (Docs. 61, 66.) After a thorough review of the record, it appears to this Court that resolution of these motions and adjudication of this case involve questions of Georgia law—regarding contract enforceability, licensing requirements, and public policy—that are determinative but unanswered by controlling precedent of the Supreme Court of Georgia or the Georgia Court of Appeals. The Court therefore respectfully **CERTIFIES** the questions below for resolution by the Supreme Court of Georgia. See O.C.G.A. § 15-2-9; Ga. Sup. Ct. R. 46.

For this reason, the Court **ADMINISTRATIVELY CLOSES** and **STAYS** this case until such time as the Supreme Court of Georgia renders its answers to the certified questions herein. The Court **DIRECTS** the Clerk of Court to transmit each party's Motion for Partial Summary Judgment and all related filings—including briefs, attachments, fact statements, declarations,

etc.—to the Supreme Court of Georgia to assist its consideration of the certified questions presented. Ga. Sup. Ct. R. 47.

## BACKGROUND

This case concerns a contract dispute between Plaintiff San Miguel Produce, Inc. ("San Miguel"), a California corporation that grows, processes, and ships produce, and Defendant L.G. Herndon Jr. Farms, Inc. ("Herndon Farms"), a Georgia corporation that grows and ships produce. (Docs. 1, 30, 31.) In September 2014, these parties entered into a "Grower-Shipper Agreement" ("the GSA"), under which Herndon Farms, "the Grower," was responsible for growing and delivering produce ordered by San Miguel, "the Shipper," to ROBO Produce LLC ("ROBO"), the jointly-owned operator of a packing and processing facility in Toombs County, Georgia. (Doc. 66-2, pp. 2–4.) Herndon Farms also agreed to source crops from other growers in the event it could not meet San Miguel's anticipated volume of orders. (Id.) In turn, San Miguel was obligated to purchase the produce delivered by Herndon Farms, to sell and market all products to regional and national accounts, and to provide sales and marking opportunities for Herndon Farms' bulk product sales. (Id.) The produce delivered by Herndon Farms was to be sold at cost to San Miguel, and the parties agreed to equally divide the profits from the sale of products processed and shipped through ROBO. (Id.) Georgia law governs this agreement. (Id. at p. 11.)

Concurrent with the GSA, San Miguel and Herndon Farms entered into an Operating Agreement creating ROBO, and San Miguel executed a Co-Packing Agreement with ROBO.[1] (Doc. 63, pp. 3–4.) Under the ROBO Operating Agreement, San Miguel and Herndon Farms were co-managers of ROBO and equal members, with each holding a fifty percent interest. (Doc. 66-

---

[1] In total, San Miguel, Herndon Farms, and ROBO entered into five agreements: (1) the GSA between San Miguel and Herndon Farms; (2) the Operating Agreement between San Miguel and Herndon Farms establishing ROBO; (3) the Co-Packing Agreement between San Miguel and ROBO; (4) an equipment-lease agreement between San Miguel and ROBO for the facility's processing equipment; and (5) a building-lease agreement between Herndon Farms and ROBO to house the facility. (Doc. 63, pp. 3–4.)

3, pp. 2, 5.) Herndon Farms was "the on-site managing member of the operation," while San Miguel retained the right to make "[a]ll decisions regarding food safety regulations, procedures and product quality." (Id. at p. 5.) Under the Co-Packing Agreement between ROBO and San Miguel, ROBO was to process and package quantities of produce that San Miguel would direct its grower to deliver at the Toombs County facility. (Doc. 64-14, p. 1.) San Miguel promised to, *inter alia*, procure and provide a sufficient supply of produce to meet San Miguel's own requirements, give oversight and direction on facility operations, and supply all necessary packaging materials. (Id. at p. 2.) The Co-Packing Agreement and the GSA were both to last for a term of five years commencing on November 1, 2014. (Id. at p. 1; doc. 66-3, p. 2.)

Herndon Farms and San Miguel's business arrangement, however, proved unsuccessful, and the relationship terminated in February 2016, less than two years after it began. (Doc. 62, pp. 1–2; doc. 66, pp. 2–3.) Over that period, issues apparently arose with Herndon Farms' ability to deliver sufficient produce, or source enough from third-party growers, to meet San Miguel's requirements. (Doc. 1, p. 13; see doc. 62, pp. 11–13 & n.6.) While the parties were able to agree on some third-party sources, San Miguel eventually began shipping its own produce from California to the ROBO facility despite Herndon Farms' concerns over high transportation costs. (See Doc. 63, pp. 5–7.) Notably, at no point during the making of the parties' agreements or during their short-lived business arrangement did San Miguel obtain the Georgia state license required by O.C.G.A § 2-9-2 for dealers in agricultural products.[2] (Doc. 63, pp. 2–3; see doc. 79, pp. 6–8.)

The instant litigation began on March 25, 2016, when San Miguel filed suit against Herndon Farms. (Doc. 1.) Herndon Farms then filed a separate action against San Miguel on April 5, 2016. See Notice, L.G. Herndon Jr., Farms, Inc. v. San Miguel Produce, Inc., No. 6:16-

---

[2] Both San Miguel and Herndon Farms hold federal licenses to buy and sell produce in interstate commerce. (Doc. 1, p. 1; doc. 30, p. 15.)

3

CV-043 (S.D. Ga. Apr. 12, 2016), ECF No. 1. The two actions were consolidated into this single case on December 6, 2016, (doc. 29), and the consolidated case was reassigned for plenary disposition to the undersigned on September 4, 2018, (doc. 87). Each party brings several causes of action against the other arising out of their failed grower-shipper arrangement. (Docs. 1, 30.) The matter is now at the summary judgment stage with San Miguel and Herndon Farms each filing a Motion for Partial Summary Judgment. (Docs. 61, 66.)

## DISCUSSION

Though the legal and factual disputes in this case are many, (see docs. 62, 66, 76, 79, 83, 85), much of the case turns on the determinative question of whether the GSA is unenforceable and void under Georgia law. At its core, this case concerns San Miguel's allegation that Herndon Farms breached the GSA by failing to deliver produce as required under that agreement, (see doc. 1),[3] and Herndon Farms' counter-allegation that San Miguel breached the GSA by failing to remit payment on all produce delivered by Herndon Farms, (see doc. 30).[4]

In fact, following discovery and summary judgment briefing, Herndon Farms' only remaining claims against San Miguel concern two alleged breaches of the GSA—one for failing to pay invoices on produce Herndon Farms delivered and the other for inducing Herndon Farms to grow produce before terminating the GSA. (See Doc. 76, pp. 1–2 & n.1; doc. 30, pp. 17, 20–22.) Similarly, apart from San Miguel's federal-law claim for allegedly misweighed produce and its breach of the ROBO Operating Agreement claim, San Miguel's only remaining claims against

---

[3] San Miguel has abandoned its PACA violation and negligent misrepresentation claims premised on Herndon Farms' alleged passing off of others' produce as its own. (Doc. 79, p. 6 n.3.)

[4] Herndon Farms has abandoned its claims for a PACA trust and declaratory judgment of priority, for lost profits on the GSA, for breach of the ROBO Operating Agreement and a loss of investment thereupon, and for breach of a third-party creditor agreement. (Doc. 76, pp. 1–2 & n.1.)

4

Herndon Farms concern the GSA.[5] (See Doc. 79, p. 6 n.3; doc. 1, pp. 15–17, 20–22.) As such, the GSA is the locus of this case.

In moving for summary judgment, however, Herndon Farms argues San Miguel's failure to comply with Georgia's Dealers in Agricultural Products Act, O.C.G.A. § 2-9-1 *et seq.* ("the Act"), renders the GSA void and unenforceable. (Doc. 62, pp. 3–8.) San Miguel's contention in response is twofold. San Miguel first argues it is exempt from the Act because it qualifies as a "farmer" pursuant to O.C.G.A. § 2-9-15(a)(1); San Miguel alternatively argues that, but even if it is not exempt, its failure to be licensed does not render the GSA void because, it contends, the Act was not intended to regulate business in the public interest. (Doc. 79, pp. 6–8.) Replying, Herndon Farms argues that San Miguel—a purchaser, marketer, and seller of Herndon Farms and others' produce under the GSA—does not qualify for the "farmer" exemption. (Doc. 83, pp. 9–10.) Herndon Farms also maintains that the Act is intended to protect the public and is not merely for revenue purposes, thereby making San Miguel's failure to obtain an agricultural dealer license a bar to recovery under the GSA. (Id. at pp. 11–13.) These arguments raise two issues of first impression under Georgia law that call out for resolution by the Supreme Court of Georgia.

---

[5] San Miguel brings a claim against Herndon Farms under the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. § 499(a) *et seq.*, for allegedly misweighed and improperly invoiced produce that resulted in overcharges (and thus overpayment by San Miguel). (Doc. 1, p. 20.) San Miguel also maintains negligent misrepresentation and unjust enrichment claims regarding the same. (Id. at pp. 21–22.) These latter claims for negligent misrepresentation and unjust enrichment, however, are bound up in the GSA as it obligated Herndon Farms to "harvest, grade and deliver [produce] in accordance with best industry standards and practices and as specified from time to time by [San Miguel], and in accordance with all federal, state and local laws, rules and regulations." (Doc. 66-2, p. 3.) Herndon Farms also agreed to "[i]nvoice [San Miguel] on a weekly basis for all amounts and sums due under the terms of [the GSA]." (Id.)

5

**I.     Georgia Law at Issue Here**

   **A.     The Dealers in Agricultural Products Act**

In Georgia, a dealer in agricultural products must obtain a state license, issued by the Commissioner of Agriculture, in order to lawfully conduct an agricultural dealing business within the state. O.C.G.A. §§ 2-9-1, -2. "It shall be unlawful for any dealer in agricultural products who comes within the terms of this article to engage in such business in this state without a state license issued by the Commissioner." Id. § 2-9-2. A "[d]ealer in agricultural products" is "any person . . . or corporation engaged in the business of buying, receiving, selling, exchanging, negotiating, or soliciting the sale, resale, exchange, or transfer of any agricultural products purchased from the producer or his or her agent or representative . . . or received to be handled on a net return basis from the producer."[6] Id. § 2-9-1(2). As is relevant here, this licensing regulation does not apply to "[f]armers or groups of famers in the sale of agricultural products grown by themselves." Id. § 2-9-15(a)(1).

For those entities subject to the Act, in addition to having to pay an annual license fee,[7] they must follow detailed regulatory requirements set forth in the Act. For example, a dealer license applicant must provide a surety bond in an amount determined by the Commissioner (not to exceed $230,000) or a cash bond, so as to secure the faithful accounting of agricultural products the dealer handles or sells. Id. § 2-9-5. To be approved, an applicant also must meet certain criteria, including not having made any false statements about produce quality, quantity, or market conditions. Id. § 2-9-7. The Act empowers the Commissioner to investigate licensed dealers and applicants alike, id. § 2-9-10, and licensed dealers are obligated in certain circumstances to have

---

[6] Under the Act, producer "means any producer of agricultural products." O.C.G.A. § 2-9-1(5).

[7] In an amount not to exceed $400.00. O.C.G.A. § 2-9-4.

poor quality produce deliveries inspected by the state, id. § 2-9-11. Moreover, dealers in agricultural products are prohibited from selling products that do not meet quality standards established by the Commissioner, id. § 2-9-12, and are subject to injunctions as well as misdemeanor charges for violating the Act, id. §§ 2-9-14, -16.

### B. Contract Enforceability by Unlicensed Businesses

In Georgia, an entities' failure to have a required license to engage in business within the state may render the entities' contract unenforceable. Under longstanding Georgia law,

> where a statute provides that persons proposing to engage in a certain business shall procure a license before being authorized to do so, and where it appears from the terms of the statute that it was enacted not merely as a revenue measure but was intended as a regulation of such business in the interest of the public, contracts made in violation of such statute are void and unenforceable. Accordingly, at whatever stage of the proceedings it appears that the plaintiff is seeking to recover upon a contract permitted to be entered into only by persons holding licenses issued as a regulatory measure, it becomes imperative for the plaintiff to prove that he holds such a license and held such license at the time the contract was entered into in order to authorize a recovery.

Paulsen St. Inv'rs v. EBCO Gen. Agencies, 514 S.E.2d 904, 906 (Ga. Ct. App. 1999) (quoting Bowers v. Howell, 417 S.E.2d 392, 393 (Ga. Ct. App. 1992)) (applying rule to unlicensed insurance premium finance company).

This rule has often been applied to void the contracts of entities involved in various types of development work, e.g. Brantley Land & Timber, LLC v. W & D Invs., Inc., 729 S.E.2d 458 (Ga. Ct. App. 2012) (utility contractor), JR Constr./Elec., LLC v. Ordner Constr. Co., 669 S.E.2d 224 (Ga. Ct. App. 2008) (electrical contractor); as well as those in professional roles, e.g. Siegrist v. Iwuagwa, 494 S.E.2d 180 (Ga. Ct. App. 1997) (chiropractor), Padgett v. Silver Lake Park Corp., 149 S.E. 180 (Ga. 1929) (real estate broker). More closely aligned with the facts at hand, the Georgia Court of Appeals has invalidated the contract of a wholesale liquor distributor that failed to obtain a license before engaging in distribution. Bernstein v. Peters, 22 S.E.2d 614, 615 (Ga.

Ct. App. 1942). On the other hand, Georgia courts have declined to invalidate contracts when the at-issue license merely concerned taxes or fees, rather than a comprehensive regulatory scheme. See, e.g., Strother v. Mut. Ben. Health & Accident Ass'n, 176 S.E. 84, 85 (Ga. Ct. App. 1934) (insurance company's failure to pay adjuster registration fee did not void contract because "nothing [was] required as to adjusters of insurance companies more than the payment of the tax itself[, and there was] no provision . . . as to their qualifications or good character or as to their giving bond, or for their removal for malfeasance"); Alston v. New York Contract Purchase Corp., 138 S.E. 270 (Ga. Ct. App. 1927) (corporation's failure to register and pay fee prescribed by statute did not void its contracts because the provision was merely part of a revenue tax).

Unfortunately for this Court, however, the specific issue of whether the Dealers in Agricultural Products Act qualifies as such a regulatory measure in the public interest, rather than merely for revenue generation, has not been addressed by any Georgia appellate court.

## II.     Certifying Questions of Georgia Law

Georgia law authorizes federal district courts to certify questions of state law to the Supreme Court of Georgia if "there are no clear controlling precedents in the decisions" of state appellate courts, and the questions "are determinative of the case." O.C.G.A. § 15-2-9(a); Ga. Sup. Ct. 46. "When substantial doubt exists about the answer to a material state law question upon which the case turns, a federal court should certify that question to the state supreme court in order to avoid making unnecessary state law guesses and to offer the state court the opportunity to explicate state law." Looney v. Moore, 861 F.3d 1303, 1314 (11th Cir. 2017) (citation omitted). Certification is not obligatory, however, and "[i]ts use in a given case rests in the sound discretion of the federal court." Lehman Bros. v. Schein, 416 U.S. 386, 390–91 (1974). In this regard, the Eleventh Circuit's practice has been to resort to certification "with restraint" upon consideration of the following factors: "the closeness of the question and the existence of sufficient sources of

state law . . . to allow a principled rather than conjectural conclusion," "the degree to which considerations of comity are relevant," the "practical limitation of the certification process," and "judicial efficiency." City of Rome v. Hotels.com, L.P., 549 F. App'x 896, 904 (11th Cir. 2013) (per curiam) (citation omitted).

While the general rule at issue here is straightforward—the failure to obtain a license required by an act intended to regulate in the public interest, rather than only for revenue purposes, will render a pertinent contract void—its application is not necessarily so, as it demands consideration of state public policy and legislative intent.[8] The Court has reviewed the relevant case law in this arena and has found no controlling precedent that would permit a principled application of the subject rule without this Court making conjectural conclusions and wading into questions of state public policy.[9] Although cases concerning regulatory requirements with similar provisions exist, there are no cases speaking directly to the terms and nature of the Dealers in Agricultural Products Act. Furthermore, certain regulatory features, such as the requirement of a bond, have been noted as a key reason to find a law regulatory in nature, while at other times they have been brushed over to find the contrary. Compare McLamb v. Phillips, 129 S.E. 570, 571 (Ga. Ct. App. 1925) (noting importance of bond requirement in striking down contract of unlicensed payday lender), with Kingman Distrib. Co. v. Davis, 14 S.E.2d 242, 243–44, 246 (Ga.

---

[8] See Ga. Cent. Credit Union v. Weems, 278 S.E.2d 88, 90 (Ga. Ct. App. 1981) (voiding credit union's contract where the provisions of the subject act showed the "plain intention of the legislature that the act . . . was not one for revenue purposes only, but provided for regulation and control, in the interest of public welfare"); see also Brantley Land & Timber, LLC, 729 S.E.2d at 459 ("[A] party's failure to obtain a license to engage in certain businesses can void the party's business contracts, if the licensing requirement is part of [a] regulatory scheme in the public interest.").

[9] Notably, state courts in other jurisdictions have found that similar agricultural licensing requirements were of such regulatory quality so as to render contracts by unlicensed dealers void. See Timmerman v. Grain Exch., LLC, 915 N.E.2d 113 (Ill. App. Ct. 2009); Mincks Agri Ctr., Inc. v. Bell Farms, Inc., 611 N.W.2d 270 (Iowa 2000); St. John Farms, Inc. v. D.J. Irvin Co., Inc., 609 P.2d 970 (Wash. Ct. App. 1980); Cal. Chicks, Inc. v. Viebrock, 254 Cal. App. 2d 638 (Cal. Dist. Ct. App. 1967).

9

Ct. App. 1941) (failure of transporter to obtain a license did not render contract unenforceable notwithstanding the subject act's bond requirement).

Given the lack of a consistent, guiding framework or regulatory feature on which this Court could ground a decision, such as the Act's bond requirement, the questions presented here necessarily implicate state-law policy considerations and legislative-intent inquires most appropriate for the Supreme Court of Georgia's determination. It comes as no surprise then that Georgia's highest court has previously been asked by the Georgia Court of Appeals to answer whether a particular unlicensed entity can recover on its business contract. See Mgmt. Search, Inc. v. Kinard, 199 S.E.2d 899, 900 (1973) (answering no); Padgett, 149 S.E. at 180 (also answering no). This background and the policy laden nature of the contract rule at issue here militate toward allowing the Supreme Court of Georgia to expound on whether San Miguel may enforce the GSA despite not holding an agricultural dealer license.

What is more, the Court's review of Georgia law has not found any relevant cases interpreting the provisions of the Dealers in Agricultural Products Act, whether in the context of unlicensed dealers asserting contract claims arising out of their unlicensed activity or otherwise.[10] Indeed, no Georgia state court has passed on the farmer exemption codified at O.C.G.A. § 2-9-15(a)(1), which San Miguel argues applies to it, or any other provisions of the Act relevant here. Given the lack of controlling precedent and the noted public policy implications, the Court finds it prudent to have the Supreme Court of Georgia speak to the Act's meaning and effect. "[A] proper respect for the principles of federalism counsels certification here." Pier 1 Cruise Experts

---

[10] In footnote dicta, the United States District Court for the Northern District of Georgia indicated the Act would not render an unlicensed dealer's contract illegal and unenforceable; but the issue there was whether the lack of a license would preclude a PACA trust claim, which the court found it would not. See Classic Harvest LLC v. Freshworks LLC, No. 1:15-CV-2988-WSD, 2017 WL 2350212, at *16 & n.25 (N.D. Ga. May 31, 2017). Thus, in addition to the fact that it is not a Georgia appellate court decision, Classic Harvest is of no moment here because it provides no analysis of, or findings as to, the contract-claim, state-statute issue squarely raised in this case.

v. Revelex Corp., 929 F.3d 1334, 1349 (11th Cir. 2019). Moreover, resolution of the GSA's enforceability in light of San Miguel's failure to obtain an agricultural dealer license will be determinative in this case.

Accordingly, based on the foregoing, the Court **CERTIFIES** the following questions to the Supreme Court of Georgia:

(1) Does an entity that purchases produce from other growers, has it processed, and then markets, sells, and ships that produce qualify as a "[d]ealer in agricultural products" as defined in O.C.G.A. § 2-9-1(2), or does that entity meet the "farmers in the sale of agricultural products grown by themselves" exemption in O.C.G.A. § 2-9-15(a)(1) because at times it *also* processes, markets, sells, and ships produce that it grew itself as part of the same business operation?

(2) Under the contract rule restated in Paulsen St. Investors v. EBCO General Agencies, 514 S.E.2d at 906, and quoted in this Order, are the licensing requirements set forth by the Dealers in Agricultural Products Act, O.C.G.A. § 2-9-1 *et seq.*, regulatory in the public interest or merely for revenue purposes?

(3) If a "[d]ealer in agricultural products," as defined by O.C.G.A. § 2-9-1(2), fails to obtain a license, as required by O.C.G.A. § 2-9-2, prior to engaging in a business that comes within the terms of the Act, is it precluded from recovering on a contract made to carry out that business?

The phrasing and order of the above questions is not intended to restrict, in any way, the Supreme Court of Georgia's consideration and resolution of these issues. The questions posed are merely suggestive and do not constrain the Supreme Court's scope of inquiry. Intervest Constr. of Jax, Inc. v. Gen. Fid. Ins. Co., 662 F.3d 1328, 1333 (11th Cir. 2011).

## CONCLUSION

For the reasons stated above, the Court **CERTIFIES** the aforementioned questions for resolution by the Supreme Court of Georgia. See O.C.G.A. § 15-2-9; Ga. Sup. Ct. R. 46. In light of this, the Court **ADMINISTRATIVELY CLOSES** and **STAYS** the case until such time as the Supreme Court of Georgia issues its answers to the certified questions herein. The Court **DIRECTS** the Clerk of Court to transmit each party's Motion for Partial Summary Judgment and

all related filings—including briefs, attachments, fact statements, declarations, etc.—to the Supreme Court of Georgia to assist its consideration of the certified questions presented. Ga. Sup. Ct. R. 47.

**SO ORDERED**, this 11th day of September, 2019.

R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA