**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION**

| | |
|---|---|
| SAN MIGUEL PRODUCE, INC., | |
| Plaintiff, | CIVIL ACTION NO.: 6:16-cv-35 |
| v. | |
| L.G. HERNDON JR. FARMS, INC., | |
| Defendant.[1] | |

## O R D E R

This case concerns a contract dispute between Plaintiff San Miguel Produce, Inc., a shipper of produce, and Defendant L.G. Herndon Jr. Farms, Inc., a grower of produce. (Docs. 1, 30.) These parties entered into a grower-shipper agreement, under which L.G. Herndon Jr. Farms, Inc. ("Herndon Farms") was responsible for growing, harvesting, and delivering produce ordered by San Miguel Produce, Inc. ("San Miguel"), to a packing facility in Toombs County, Georgia, which was owned by an entity the parties had jointly formed. (Doc. 1, p. 5.) Their business relationship, however, eventually took a turn for the worse, and the present litigation ensued. (See id. at pp. 11–15.) At bottom, San Miguel alleges that Herndon Farms breached the terms of their grower-shipper agreement by not supplying the produce required thereunder, (doc. 1), while Herndon Farms alleges that San Miguel failed to remit payment for some of the produce it delivered, (doc. 30). After each party initially filed suit separately against the other, the Court, with the parties' consent, consolidated their actions into this single case. (Doc. 29.)

---

[1] Also present in this action are Consolidated Defendants Roy L. Nishimori and Janis Berk, officers of San Miguel Produce, Inc., who are being sued pursuant to Defendant L.G. Herndon Jr. Farms, Inc.'s counterclaims against Plaintiff San Miguel Produce, Inc. (See doc. 30.)

The matter is now before the Court on each party's respective Motion for Partial Summary Judgment.[2]  (Docs. 61, 66.)  Herndon Farms moves for summary judgment as to all claims raised by San Miguel and as to its own first and third counterclaims.  (Docs. 61; see also doc. 62.)  San Miguel, meanwhile, moves for partial summary judgment on all but two of Herndon Farms' counterclaims.  (Doc. 66.) These issues have been fully briefed, (docs. 62, 66, 76, 79, 83, 85), and are ripe for review.  For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** Herndon Farms' Motion for Partial Summary Judgment, (doc. 61), and **GRANTS** San Miguel's Motion for Partial Summary Judgment, (doc. 66).

## BACKGROUND

### I.    Factual Background

San Miguel, a California corporation, grows, processes, and distributes produce.  (Doc. 22, p. 2.)  Herndon Farms, a Georgia corporation, grows, distributes, and brokers produce.  (Id.)  In September 2014, San Miguel and Herndon Farms executed a grower-shipper agreement ("GSA"),

---

[2]  Also, before the Court is Herndon Farms' Limited Objections, (doc. 92), to the Magistrate Judge's Order on both parties' Motions *in Limine*, (doc. 89).  In its Objection, Herndon Farms argues that the Magistrate Judge incorrectly excluded Michael Hively's testimony that San Miguel did not make a reasonable business decision concerning shipping produce across the United States.  (Doc. 92, pp. 4–11.)  Michael Hively's testimony about shipping is only relevant as to San Miguel's first breach of contract claim, which asserts in part that San Miguel "incurr[ed] additional and unnecessary freight charges" to ship produce from California to Georgia.  (Doc. 1, p. 16.)  As the Court will explain below, San Miguel cannot bring this claim.  See Discussion Section II.A.2, infra.  Thus, Hively's testimony is no longer relevant, and Herndon Farms' challenge to the Magistrate Judge's Order to exclude it is **DENIED AS MOOT**.  Herndon Farms also argues that the Magistrate Judge erred in excluding the testimony of Richard Deal.  (Doc. 92, pp. 13–16.)  Richard Deal is a certified public accountant who has reviewed several documents in this case.  (Doc. 89, pp. 13–14.)  A review of Deal's report indicates that his testimony is also related to San Miguel's first breach of contract claim.  (See doc. 67-1, p. 3 ("Computing the difference between the quantities as specified in the production schedules and the amounts shipped by [Herndon Farms] is not alone a sufficient measure of [Herndon Farms'] compliance with the Grower-Shipper Agreement.").)  However, Deal's report also includes conclusions about the "total pounds" that Herndon Farms delivered to San Miguel, which may be relevant to San Miguel's claims involving "misweighing produce" (Counts V and VI).  (See id.)  Accordingly, the Court **ORDERS** Herndon Farms to file a statement within **fourteen (14) days of this Order** explaining whether it still seeks to challenge the Magistrate Judge's Order excluding Deal, and, if it does challenge the order, explaining why it contends Deal's testimony is still relevant.  San Miguel will then have **fourteen (14) days from the date of Herndon Farms' filing** to file a response.

under which Herndon Farms agreed to grow, harvest, and deliver produce—ordered by San Miguel—to a packing facility in Toombs County, Georgia. (Doc. 66-2.) This facility was owned by ROBO Produce, LLC ("ROBO"), an entity the parties formed together. (Doc. 63, p. 4; doc. 66-3, p. 2.) San Miguel and Herndon Farms were equal members of ROBO, but San Miguel and ROBO had a separate Co-Packing Agreement whereby ROBO was compensated by San Miguel for processing the produce delivered by Herndon Farms.[3] (Doc. 66-3, p. 2; doc. 64-14, p. 2.) At the time the parties made these agreements and throughout their business relationship, San Miguel did not have an agricultural dealer's license for the State of Georgia. (Doc. 63, pp. 2–3.)

### A.    Relevant Terms of the GSA

San Miguel and Herndon Farms entered into the GSA "to create a mutually beneficial business relationship with respect to the production and distribution of [San Miguel's] 'Cut 'N Clean Greens' brand." (Doc. 66-2, p. 2.) To that end, they executed a "contractual growing arrangement," but they explicitly disavowed any intention to create "a joint venture or a partnership." (Id.) Nonetheless, Herndon Farms agreed to sell produce "at cost" to San Miguel, and the parties agreed to "divide equally the profits from the sale of all products processed, packed and shipped through" ROBO. (Id. at p. 4.) This profit-sharing included proceeds from additional crops that Herndon Farms did not itself grow but "actively participated in securing and delivering" to ROBO from third parties. (Id.) The GSA was slated to last for five years beginning on November 1, 2014. (Id. at p. 2.) Any changes to the GSA had to "be in writing and signed by both parties." (Id. at p. 10.)

---

[3] In total, San Miguel, Herndon Farms, and ROBO entered into five agreements: (1) the GSA between San Miguel and Herndon Farms; (2) the Operating Agreement between San Miguel and Herndon Farms establishing ROBO; (3) the Co-Packing Agreement between San Miguel and ROBO; (4) an equipment-lease agreement between San Miguel and ROBO for the facility's processing equipment; and (5) a building-lease agreement between Herndon Farms and ROBO to house the facility. (Doc. 63, pp. 3–4.)

Herndon Farms was responsible for "[g]rowing, harvesting, and delivering" to ROBO "fresh produce, crops and varieties of raw vegetables . . . in such quantities and prices as described in Addendum A, attached, and as may be modified in writing by the Parties from time to time during the term of [the GSA]." (Id. at p. 2.)  The GSA required Herndon Farms to "make a good faith effort to grow Crops in sufficient quantity to meet the anticipated volume of orders set forth in Addendum A."  (Id. at p. 3.)  The attached Addendum A, however, does not specify any quantities, only prices.  (Id. at p. 13.)  Specifically, Addendum A provides that "Fresh Cut Greens-Conventional" were to be sold at $0.30 per field pound, and "Fresh Cut Greens-Organic" were to be sold at $0.40 per field pound.  (Id.)

As for San Miguel, the GSA obligated it to purchase from Herndon Farms "the [c]rops set forth in Addendum A, attached, as the same are harvested during the calendar year, including such Crops as may be provided pursuant to Section 2.f." (Id. at p. 3.)  In addition to agreeing to buy crops from Herndon Farms, San Miguel agreed to "[m]anage all sales and marketing of packaged fresh-cut products," including "sell[ing] and market[ing] all products to regional and national accounts."  (Id. at p. 4.)  Further, San Miguel would "[p]rovide sales and marketing opportunities for [Herndon Farms'] bunch/bulk product sales."  (Id.)

Under the terms of the GSA, neither party had the right to terminate the agreement within its five-year term "except for cause." (Id. at p. 5.)  Both parties also agreed "to mediate any dispute or claim arising out of [the GSA] before resorting to any legal action," and they agreed that if either party "commence[d] legal action without first attempting to resolve the matter through meditation . . . then that party shall not be entitled to recover attorney's fees, even if attorney's fees would otherwise be available to that party . . . ."  (Id. at p. 6.)

**B.      The Business Relationship**

Roy Nishimori and Jan Berk own San Miguel, and L.G. "Bo" Herndon, Jr. is the principal of Herndon Farms.  (Doc. 63, p. 2.)  Mr. Herndon and Mr. Nishimori first met in the 1990s when San Miguel opened a fresh cut greens processing plant in Atlanta, Georgia.  (Id. at p. 3.)  In 2013, San Miguel began efforts to open a new east-coast processing facility, and Mr. Nishimori contacted Mr. Herndon in this regard.  (Id.)  Their discussions culminated in 2014, when the parties entered into a series of agreements, including the GSA and the Operating Agreement that created the jointly-owned ROBO.[4]  (Id.)

Herndon Farms planted produce according to 2014–2015 sales projections that San Miguel had provided approximately two months before they finalized and executed the GSA.  (Doc. 66-11, p. 24; see doc. 64-8, pp. 41–45.)  In addition, throughout their business relationship, San Miguel would send Herndon Farms "numerous projections of what product [it] thought [it] needed."[5]  (Doc. 66-11, p. 10.)  Herndon Farms in turn "would figure out what acreage [it needed] . . . to produce that volume to suffice [San Miguel's] needs."  (Id.)  San Miguel normally bought greens from Herndon Farms on credit and then later remitted payment per Herndon Farms' invoices.  (Doc. 63, pp. 7–8.)  San Miguel made payments to Herndon Farms, without objection, for produce that was delivered and invoiced until December 2015,  when it stopped making payments due to purported weight issues with Herndon Farms' delivered product.  ((Doc. 66-1, p. 3; doc. 66-15, p. 23.)  Specifically, San Miguel concluded that Herndon Farms was overbilling it for greens based on inaccurate weights.  (Doc. 66-15, p. 23.)  It contends that Herndon Farms' billing and weighing practices resulted in more than $250,000 in overcharges.  (Doc. 79, p. 17.)  As a result, in San

---

[4]  The ROBO moniker is derived from the names of Roy Nishimori and Bo Herndon.  (Doc. 66, p. 3.)

[5]  Over the course of 2015, however, problems arose with Herndon Farms' fulfillment of San Miguel's orders.  (See doc. 63, p. 7.)  During the summer, beginning in May, San Miguel decided to ship organics from California to the ROBO facility.  (Id.)

Miguel's estimation, Herndon Farms had an overall negative account balance, making further payment unwarranted.  (Doc. 66-15, p. 23.)  Although San Miguel disputes the accuracy of Herndon Farms' invoices, it is undisputed that the unpaid invoices—ranging from December 18, 2015 to February 1, 2016—total $486,095.83.  (Doc. 63, p. 8.)

Though neither party clearly explains the invoice and weighing process, it appears that Herndon Farms would weigh between three and five totes of product from a pallet before delivery; the shipment's full weight would then be calculated from these sample weights.  (Doc. 79-6, p. 8.) Herndon Farms would invoice San Miguel based on this weight calculation.  (Id.)  When that shipment arrived at ROBO, however, employees there would weigh and record the weight of each individual pallet.  (Doc. 79-7, pp. 6–7.)  The scales utilized at the ROBO facility—initially a table scale and later a pallet scale—were not certified by the State of Georgia.  (Doc. 63, pp. 8–9.)  Using these ROBO weights, Mr. Nishimori conducted a comparative analysis with the invoiced weights and concluded that Herndon Farms had billed for approximately 740,000 pounds of produce not reflected in the ROBO weight reports.  (Doc. 79-4, p. 14.)  Notably, however, at no time did San Miguel obtain an inspection certificate from the United States Department of Agriculture ("USDA") regarding the weight of any of the produce that was delivered.  (Doc. 63, p. 9.)

It became apparent in the fall of 2015 that the existing business format was not functioning well.  (Id.)  The parties attempted to rectify the situation by negotiating a modified agreement, but they were unable to reach agreeable terms. (Docs. 76-2, 76-3, 76-4, 76-5.)  In one email, Mr. Nishimori proposed "developing new subsequent agreements for 2016" and offered to pay $0.36 per pound for "Conventional" product and $0.58 per pound for "Organic" product.  (Doc. 76-4, pp. 2–3.)  In subsequent emails, Mr. Herndon disagreed with the organic produce price, (doc 76-

4, p. 2), and offered to grow the "greens" for $0.40 per pound, (doc. 76-5, p. 2).[6]  The parties did

not reach a modified agreement.  (Doc. 63, pp. 9–10.)  The ROBO facility closed in February 2016.

(Id. at p. 10.)  Around this same time—February 2016—San Miguel formally notified Herndon

Farms of its alleged breach of the GSA.  (Doc. 64-8, p. 38.)

### C.     ROBO and the Operating Agreement

The parties intended the ROBO facility to be operated at cost in order "to facilitate the

other business interests and operations of the members in connection with the growing, processing,

and sale of fresh cut produce products as set forth in the [GSA] and Co-Packing Agreement."

(Doc. 66-3, p. 7.)  During the course of San Miguel and Herndon Farms' business relationship,

San Miguel "advanced money" to ROBO for operating expenses.  (Doc. 66-14, p. 91.)  These

funds, which San Miguel provided in 2014 and 2015, were entered into ROBO's balance sheet as

"accounts payable."  (Id. at p. 92.)  Following the end of ROBO's operations, the funding advanced

by San Miguel remained as an outstanding account payable on ROBO's balance sheet.  (Id. at pp.

91–92.)  According to Mr. Nishimori, ROBO owes San Miguel $296,000, half of which Herndon

Farms is responsible for given its joint ownership of ROBO.  (See id.)

As is pertinent here, the ROBO Operating Agreement sets forth the following terms

regarding profits and losses with respect to members' capital accounts:

> The net profits or net losses of [ROBO], after providing for the expenses of
> [ROBO], shall be distributable or chargeable, as the case may be, to each of the
> members according to their pro rata interest in [ROBO] as determined with
> reference to their respective capital accounts.  Profits and losses shall be credited
> or debited to the individual income accounts as soon as practicable after the close
> of each fiscal year or otherwise as may be agreed to by the members.  If there is no
> balance in a member's income account, net losses shall be debited to the member's
> capital accounts.  If the capital account of a member shall have been depleted by

---

[6]   According to his deposition testimony, in November or December 2015, Mr. Herndon informed San Miguel that Herndon Farms intended to increase prices in January and San Miguel in fact "agreed to [a price increase, but] none of that was in writing."  (Doc. 66-12, p. 30.)  According to his testimony, Herndon Farms subsequently increased prices from $0.30 per pound to $0.40 per pound.  (Id.)

the debiting of losses, future profits allocable to that member shall not be credited to his or her income account until the depletion in his or her capital account shall have been made up, but shall be credited to his or her capital account. After the depletion in the member's capital account shall have been made up, the member's subsequent share of the profits of the Company shall be credited to his or her income account.

(Doc. 66-3, p. 7.) Further, under the Operating Agreement, ROBO members were permitted, but not required, to make loans to the company "in an amount, at a time and on terms as may be approved by resolution of the members. No loan in this manner shall be considered a contribution to capital." (Id. at p. 8.)

Upon dissolution, pursuant to the Operating Agreement, ROBO was to first pay or adequately provide payment for "all known debts" except "debts owing to members." (Id. at p. 12.) ROBO's remaining assets were to be distributed in the following order of priority:

   (a) To pay the expenses of liquidation.

   (b) To repay outstanding loans to members. If there are insufficient funds to pay those loans in full, each member shall be repaid in the ratio that the member's respective loan, together with accrued and unpaid interest, bears to the total of all those loans from members, including all interest accrued and unpaid on those loans. . . .

   (c) Among the members in accordance with their pro rata interests provisions.

(Id.) Under the agreed upon terms, San Miguel and Herndon Farms, as members, shall "look solely to the assets of [ROBO] for the return of [their] investment." (Id.) Furthermore, "if the [ROBO] property remaining after the payment or discharge of the debts and liabilities of [ROBO] is insufficient to return the investment of any member, the member shall have no recourse against any other members for indemnification, contribution, or reimbursement." (Id.)

Attempting to reach an agreeable end, Herndon Farms and San Miguel executed an agreement in the spring of 2016 whereby San Miguel took responsibility for all of ROBO's

outstanding bills owed to third parties, while San Miguel took possession of the remaining inventory and stock.  (Doc. 79-4, pp. 9–10.)

## II.    Procedural History

San Miguel commenced this action on March 25, 2016, alleging, *inter alia*, that Herndon Farms breached the GSA, misrepresented the nature of the produce it supplied, and violated the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. § 499(a) *et seq*.  (Doc. 1.)  On April 5, 2016, Herndon Farms filed suit against San Miguel in the Superior Court of Toombs County, Georgia, which San Miguel promptly removed to this Court.  See Notice of Removal, L.G. Herndon Farms Jr., Inc. v. San Miguel Produce, Inc., 6:16-cv-43 (S.D. Ga. Apr. 12, 2016), ECF No. 1.  Thereafter, Herndon Farms moved to dismiss San Miguel's Complaint in the present action, (docs. 5, 20), and to remand its separate action back to state court, see Motion to Remand, id. at ECF No. 4.

Herndon Farms argued that, pursuant to the forum selection clause contained in the GSA, its action should be remanded, id., and San Miguel's Complaint dismissed, (doc. 5).  The Court, however, denied these Motions.  (Doc. 22.)  In so doing, the Court found that Herndon Farms waived the forum selection clause when, on February 1, 2016, it elected to begin informal proceedings before the USDA regarding San Miguel's failure to pay.  (Id. at pp. 5–9.)  The Court rejected Herndon Farms' contention that the proceeding it instituted before the USDA was merely a request for mediation consistent with the parties' agreement to mediate prior to commencing legal action.  (Id. at pp. 2, 7 n.5.)  Additionally, the Court denied Herndon Farms' requests for attorney's fees in both actions.  (Id. at pp. 9–12.)

The parties then filed a Consent Motion to Consolidate Cases pursuant to Federal Rule of Civil Procedure 42(a), which the Court granted.  (Docs. 27, 29.)  Upon consolidation of the two

cases, Herndon Farms filed a Second Amended Answer, Defenses and Counterclaims, and First Amendment to Complaint, (doc. 30), and San Miguel filed its Answer to Herndon's Second Amended Counterclaims and First Amended Complaint, (doc. 31).  Following discovery, San Miguel and Herndon Farms each filed a Motion *in Limine* seeking to exclude the testimony of the opposing party's expert(s) pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  (Docs. 65, 67.)  The Magistrate Judge granted in part and denied in part both parties' Motions.  (Doc. 89.)  As is relevant here, the Magistrate Judge excluded expert testimony proffered by two of Herndon Farms' expert witnesses, Mr. Richard Deal and Mr. Michael Hively.  (Id. at pp. 13–21.)

Pursuant to Federal Rule of Civil Procedure 72(a), Herndon Farms filed Limited Objections to the Magistrate Judge's Order, appealing the Order's exclusion of testimony from Mr. Deal and Mr. Hively.  (Doc. 92.)  Prior to Herndon Farms' appeal of the Magistrate Judge's decision, both San Miguel and Herndon Farms had already filed their present Motions for Partial Summary Judgment.  (Docs. 61, 66.)

On September 11, 2019, the Court certified three questions to the Supreme Court of Georgia.  (Doc. 99, p. 11.)  The Court ordered that this case be administratively closed and stayed until the Georgia Supreme Court answered the certified questions.  (Id. at pp. 11–12.)  On May 18, 2020, the Georgia Supreme Court issued an opinion answering the three certified questions.  San Miguel Produce, Inc. v. L. G. Herndon Jr. Farms, Inc., 843 S.E.2d 403 (Ga. 2020).

## III.  The Parties' Claims and Counterclaims

### A.  Plaintiff San Miguel's Claims

San Miguel brings seven causes of action against Herndon Farms.  (Doc. 1.)  In Count I, San Miguel alleges that Herndon Farms breached the GSA by failing to supply the amount of

produce required by San Miguel and by failing to meet industry standards in its farming and harvesting practices. (Id. at pp. 15–17.) As a result of Herndon Farms' alleged breach, San Miguel was forced to deliver product from California and incur unnecessary freight charges of $492,607.00. (Id. at 16.) In Count II, San Miguel alleges that Herndon Farms breached the ROBO Operating Agreement by making improper distributions to itself and by failing to make contributions to its ROBO account to satisfy obligations to creditors. (Id. at pp. 17–18.)

In Counts Three and Four, San Miguel alleges that Herndon Farms violated PACA and engaged in negligent misrepresentation by "passing off" others' produce as its own, thereby allegedly causing economic harm. (Id. at pp. 18–20.) In Counts Five, Six, and Seven, San Miguel alleges that Herndon Farms violated PACA, engaged in negligent misrepresentation, and unjustly enriched itself by misweighing, and overcharging for, the produce it delivered. (Id. at pp. 20–22.) Lastly, San Miguel claims it is entitled to attorney's fees under O.C.G.A. § 13-6-11. (Id. at p. 22.)

### B.    Defendant Herndon Farms' Counterclaims

Herndon Farms brings nine causes of action as counterclaims in this case. (Doc. 30.) As to the GSA related claims, Herndon Farms brings the following counterclaims. In Count I,[7] Herndon Farms alleges that San Miguel breached the contract by failing to remit payment for produce delivered and invoiced, such produce being valued at $486,095.83. (Id. at pp. 17–18.) In Count V, Herndon Farms alleges that San Miguel breached the GSA by directing Herndon Farms to grow produce for the 2016 crop year and then terminating the agreement, causing Herndon Farms to incur unnecessary expenses. (Id. at p. 22.) In Count VI, Herndon Farms alleges that it is entitled to an accounting and lost profits under the GSA for San Miguel's sale of its produce. (Id. at p. 23.) In Count IX, Herndon Farms alleges that San Miguel breached the GSA and caused

---

[7] For matters of ease of reference and consistency, the Court terms Herndon Farms' nine separate causes of action "Counts." (See doc. 30.)

lost profits by submitting a plant production schedule for the 2015–2016 crop year that underestimated the amount of kale San Miguel eventually required.  (Id. at p. 25.)

Herndon Farms also brings the following other counterclaims.  In Count II, Herndon Farms seeks the enforcement of a statutory trust under PACA regarding the unpaid invoices.  (Id. at pp. 18–20.)  In Count III, Herndon Farms alleges San Miguel failed to account and pay promptly by not paying the unpaid invoices.  (Id. at pp. 20–21.)  In Count IV, Herndon Farms seeks a declaration that, in the event a PACA trust is enforced, its claims against such trust take first priority.  (Id. at pp. 21–22.)  In Count VII, Herndon Farms alleges San Miguel breached the ROBO Operating Agreement by interfering with its contractual right to run the facility.  (Id. at pp. 23–24.)  In Count VIII, Herndon Farms alleges that San Miguel breached their agreement that obligated San Miguel to assume the third-party debts of ROBO.  (Id. at p. 24.)  Lastly, Herndon Farms claims it is entitled to statutory attorney's fees under O.C.G.A. §§ 13-1-1 and 13-6-11.  (Id. at pp. 18, 25.)

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003).  Specifically, the moving party must

identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011). When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)). However, "facts must be viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (emphasis and citation omitted).

## DISCUSSION

Though they deal with the same nucleus of facts, San Miguel and Herndon Farms' respective Motions for Partial Summary Judgment concern unique claims and issues. As such, the Court addresses each party's Motion in turn.[8]

---

[8] In Count III of its Complaint, San Miguel alleges that Herndon Farms violated PACA by "pass[ing] off [p]roduce to [San Miguel] as its own, knowing that the [p]roduce was purchased from an unapproved grower." (Doc. 1, p. 18.) San Miguel also asserts a state law claim, in Count IV, for negligent misrepresentation under the same set of facts. (Doc. 1, pp. 19–20.) In its Response brief, San Miguel states

# I.     Choice of Law

In this diversity action, the Court must apply the choice-of-law rules of its forum state of Georgia to determine which state's substantive laws apply. Boardman Petroleum, Inc. v. Federated Mut. Ins. Co., 135 F.3d 750, 752 (11th Cir. 1998). San Miguel and Herndon Farms' claims resound in contract and tort. "[I]n contract cases, [Georgia] follows the traditional doctrine of *lex loci contractus:* contracts are 'governed as to their nature, validity and interpretation by the law of the place where they were made' unless the contract is to be performed in a state other than that in which it was made." Id. (quoting Gen. Tel. Co. of Se. v. Trimm, 311 S.E.2d 460, 461 (Ga. 1984)). In addition, "the law of the jurisdiction chosen by parties to a contract to govern their contractual rights will be enforced unless application of the chosen law would be contrary to the public policy or prejudicial to the interests of this state." CS-Lakeview at Gwinnett, Inc. v. Simon Prop. Grp., Inc., 659 S.E.2d 359, 361 (Ga. 2008) (citation omitted). Here, the GSA states that it "shall be

---

that it "has decided not to pursue its claims in Counts 3 or 4." (Doc. 79, p. 6 n.3.) In addition, in its counterclaim, Herndon Farms brings a cause of action to enforce a statutory trust under PACA (Count II) and seeks a declaratory judgment under PACA (Count IV). (Doc. 30, pp. 18–22.) It also brings two breach of contract counterclaims for lost profits under the GSA (Counts VI and Count IX) and a breach of agreement to satisfy third-party creditors (Count VIII). (Id. at pp. 23–25.) San Miguel argues that it is entitled to summary judgment on these counterclaims. (Doc. 66.) It argues that summary judgment is warranted because the undisputed evidence shows that the business arrangement was unprofitable, so Herndon Farms is not entitled to lost profits. (Id. at pp. 8–9.) It also argues that the undisputed evidence shows that it satisfied all debts to third party creditors. (Id. at pp. 12–13.) Finally, it argues that Herndon Farms did not comply with requirements imposed by PACA in order to enforce a statutory trust under that statutory scheme. (Id. at pp. 6–8.) A review of the record reveals that San Miguel is correct that no dispute of fact exists on these issues. (Doc. 66-6, p. 9; doc. 66-14, p. 14.) In its Response Brief, Herndon Farms "concedes" that summary judgment is appropriate as to these counterclaims. (Doc. 76, p. 1). "[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995); see also Jones v. Bank of America, N.A., 564 F. App'x 432, 434 (11th Cir. 2014) (per curiam) ("[W]hen a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned.") (citation and quotation omitted); State Farm Mut. Auto. Ins. Co. v. Marshall, 175 F. Supp. 3d 1377, 1385 (S.D. Ga. 2016) (same). Thus, the Court **GRANTS** Herndon Farms' Motion for Summary Judgment as to Counts III and IV in San Miguel's Complaint. (Doc. 61). The Court also **GRANTS** San Miguel's Motion for Summary Judgment as to Counts II, IV, VI, VIII, and IX as to Herndon Farms' counterclaim. (Doc. 66.)

governed by, construed and determined in accordance with the [l]aws of the [s]tate of Georgia . . . ." (Doc. 66-2, p. 11.)  Neither party argues that this provision should not be enforced, and the Court also finds no reason to disregard it.  Accordingly, Georgia law will apply to both parties' contract claims.[9]

Apart from the contract claims, San Miguel also asserts a tort claim for negligent misrepresentation.  In tort actions, "Georgia continues to apply the traditional choice of law principles of *lex loci delicti*."  Willingham v. Glob. Payments, Inc., No. 1:12-CV-01157-RWS, 2013 WL 440702, at *14 (N.D. Ga. Feb. 5, 2013) (citation omitted).  Under the rule of *lex loci delicti* "a tort action is governed by the substantive law of the state where the tort was committed." Dowis v. Mud Slingers, Inc., 621 S.E.2d 413, 414 (Ga. 2005).  The parties do not dispute that the events giving rise to this action took place in the state of Georgia.  Thus, the tort claim is governed by Georgia law.

## II.   Defendant Herndon Farms' Motion for Partial Summary Judgment (Doc. 61)

Herndon Farms moves for summary judgment as to all Counts alleged in San Miguel's Complaint, including its claim for attorney's fees.  (See docs. 61, 62.)  Additionally, Herndon Farms moves for summary judgment in its favor as to its first and third counterclaims regarding San Miguel's failure to pay invoices.  (See id.)  For the reasons explained below, the Court **GRANTS IN PART** and **DENIES IN PART** Herndon Farms' Motion.  (Doc. 61.)  Specifically, the Court **GRANTS** Herndon Farms summary judgment on Counts I, II, and VII of San Miguel's

---

[9]  The ROBO Operating Agreement does not include a choice of law provision.  However, the ROBO Operating Agreement did create a "Georgia Limited Liability Company" which would "operate a processing facility in Toombs County, Georgia . . . ." (Doc. 66-3, pp. 2, 7.)  In addition, neither party argues that any law other than Georgia law should apply.  See Int'l Ins. Co. v. Johns, 874 F.2d 1447, 1458 n.19 (11th Cir. 1989) ("[B]ecause the parties failed to consider the choice of law in this diversity case, we must presume that the substantive law of the forum . . . controls.") (citation omitted).  Thus, Georgia law also applies to the parties' breach of contract claims based on the ROBO Operating Agreement.

Complaint, but **DENIES** Herndon Farms summary judgment on Counts V and VI of San Miguel's Complaint as well as San Miguel's claim for attorney's fees.  (Id.)  The Court also **DENIES** Herndon Farms' Motion for Summary Judgment on Counts I and III of its own counterclaim.  (Id.)

> **A.**   **Herndon Farms Is Entitled to Summary Judgment on San Miguel's Claims for Breach of the GSA.**

Herndon Farms moves for summary judgment on San Miguel's claims for breach of the GSA because, it contends, the GSA is both void and unenforceable.  (Doc. 62, p. 3.)  Specifically, Herndon Farms argues, among other things, that San Miguel cannot enforce the GSA because it does not have an agricultural dealer license in Georgia.  (Id. at pp. 4–8.)  Herndon Farms also argues the GSA is void due to a lack of mutuality and indefiniteness caused by the GSA's silence on the quantity of produce required by San Miguel as well as the absence of an exclusivity obligation for sourcing produce.  (Id. at pp. 9–15.)  In other words, Herndon Farms contends that, even if San Miguel had the proper license, the GSA is merely an "agreement to agree," rather than a valid requirements contract.[10]  (Id. at p. 15.)

In its Response, San Miguel argues that Herndon Farms waived the issue of the GSA's enforceability through factual admissions in its Answer, by not including an affirmative defense of illegality in its Answer, by seeking to enforce the GSA in its remand motion, and by bringing claims for breach of the GSA.  (Doc. 79, pp. 2–3.)  Additionally, San Miguel argues Herndon Farms should be estopped from contesting the GSA's enforceability because it did not raise this issue until late in the case, after seeking to enforce the GSA's forum selection clause.  (Id. at pp. 3–6.)  Taking the enforceability issue on its merits, San Miguel contends it can bring GSA claims,

---

[10] Because the Court can resolve these claims without resolving the GSA's potential lack of mutuality and indefiniteness, the Court will address this issue later this Order.  See Discussion Section II.F, infra.

despite not having an agricultural dealer license, because it is either exempt from that requirement or because being unlicensed does not render the GSA illegal or unenforceable.  (Id. at pp. 6–8.)

### (1) Herndon Farms Can Challenge the Enforceability of the GSA.

The Court has carefully considered San Miguel's position that Herndon Farms cannot challenge the GSA and finds none of its arguments availing.  First, as to Herndon Farms' admission regarding the GSA in its Answer, "[t]he existence and validity of a contract are legal conclusions not facts." MAO-MSO Recovery II, LLC v. Boehringer Ingelheim Pharm., Inc., 281 F. Supp. 3d 1278, 1283 (S.D. Fla. 2017) (citations omitted).  "The issues of contract construction and enforceability are generally questions of law for a court to resolve . . . ." SunTrust Bank v. Bickerstaff, 824 S.E.2d 717, 722 (Ga. Ct. App. 2019) (quoting Precision Planning, Inc. v. Richmark Cmties., Inc., 679 S.E.2d 43, 45 (Ga. Ct. App. 2009)).  Herndon Farms' admission, in its Answer, that the parties "entered into a valid contract and expressly agreed therein that the contract shall be governed by . . . Georgia law," (doc. 1, p. 15; doc. 30, p. 11), is—to the extent it concerns validity rather than execution and choice of law—a "legal conclusion, and, therefore, does not qualify as a judicial admission." Matter of Hoffman, No. 18-10556-WHD, 2019 WL 3403883, at *4 (Bankr. N.D. Ga. July 26, 2019); see also Cameron v. Moore, 406 S.E.2d 133, 135 (Ga. Ct. App. 1991) ("In order for a judicial admission to be binding it must be one of fact and not a conclusion of law or an expression of opinion.").  Consequently, San Miguel's argument that Herndon Farms judicially admitted the GSA's validity is without merit.

Second, as to Herndon Farms bringing counterclaims on the GSA while also challenging the contract's validity, "[a] party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3).  Third, contrary to San Miguel's interpretation of Herndon Farms' Answer, a fair reading of that pleading shows that Herndon Farms raised the issue of

illegality it now presses at summary judgment.  In its "Second Defense," Herndon Farms asserted that San Miguel cannot pursue this action because it "failed to procure a license from the Georgia Department of Agriculture."  (Doc. 30, p. 2.)  In its "Sixth Defense," Herndon Farms asserted that San Miguel's claims "are barred under the doctrine of consideration."  (Id.)  Although Herndon Farms did not invoke the word "illegal" in these defenses, the substance of its facial challenge to the GSA regarding illegality and unenforceability was made readily apparent.  These averments, while not models of clarity, provided sufficient notice of Herndon Farms' illegality defense.  Thus, because "[p]leadings must be construed so as to do justice," Fed. R. Civ. P. 8(e), the Court finds that Herndon Farms did not waive this defense.

Finally, San Miguel's argument that Herndon Farms should be judicially estopped from challenging the GSA's validity and enforceability—because it sought remand pursuant to the forum selection clause contained therein—is similarly deficient.  Judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."  New Hampshire v. Maine, 532 U.S. 742, 749 (2001) (citation omitted).  Here, however, there has been no determination in Herndon Farms' favor—whether as to remand or otherwise.  If a party's position fails to prove successful, that party is not precluded from taking a contrary position later in the case.  Jaffe v. Bank of Am., N.A., 395 F. App'x 583, 587 (11th Cir. 2010) (per curiam) (affirming court's decision to not apply judicial estoppel where the earlier, arguably inconsistent motion was denied).  Furthermore, judicial estoppel is only appropriately applied in situations where the party advancing the "inconsistent position would derive an unfair advantage," New Hampshire, 532 U.S. at 751, and it is undisputed that San Miguel has been aware of Herndon Farms' position in this regard since April 2016 when Herndon Farms filed suit in Toombs County.  In that proceeding, which San Miguel removed and

which was eventually consolidated with the present case, Herndon Farms asserted that San Miguel's ability to recover on the GSA was limited by its failure to obtain the proper license.  See Complaint at p. 9, L.G. Herndon Farms Jr., Inc. v. San Miguel Produce, Inc., 6:16-cv-43 (S.D. Ga. Apr. 14, 2016), ECF No. 1-1.  Because Herndon Farms has not yet received a favorable determination regarding the GSA and because San Miguel has long been aware of the licensure issue, estoppel should not be applied to prevent Herndon Farms from challenging the GSA.  For all of these reasons, the Court finds that Herndon Farms may challenge the enforceability and validity of the GSA.

> **(2)     San Miguel Cannot Enforce the GSA Without an Agricultural Dealer License.**

It is undisputed that San Miguel does not currently hold, and has not at any time held, a Georgia Dealer in Agricultural Products license.  (See doc. 63, p. 2.)  Herndon Farms asserts this failure renders the parties' GSA illegal and unenforceable by San Miguel.  (Doc. 62, pp. 4–8.)  San Miguel, however, contends it is exempt from this requirement as a "farmer" and that, in any event, this licensure requirement was not for the public interest and thus does not affect the validity of the GSA.  (Doc. 79, pp. 6–8.)  After reviewing Georgia case law, the Court determined that no Georgia appellate court had dealt with these issues.  (Doc. 99, p. 8.)  The Court certified the following three questions to the Georgia Supreme Court:

> (1) Does an entity that purchases produce from other growers, has it processed, and then markets, sells, and ships that produce qualify as a "[d]ealer in agricultural products" as defined in O.C.G.A. § 2-9-1(2), or does that entity meet the "farmers in the sale of agricultural products grown by themselves" exemption in O.C.G.A. § 2-9-15(a)(1) because at times it *also* processes, markets, sells, and ships produce that it grew itself as part of the same business operation?
>
> (2) Under the contract rule restated in Paulsen St. Investors v. EBCO General Agencies, 514 S.E.2d [904], 906 [(Ga. Ct. App. 1999)] . . . are the licensing requirements set forth by the Dealers in Agricultural Products Act, O.C.G.A. § 2-9-1 *et seq.*, regulatory in the public interest or merely for revenue purposes?

> (3) If a "[d]ealer in agricultural products," as defined by O.C.G.A. § 2-9-1(2), fails to obtain a license, as required by O.C.G.A. § 2-9-2, prior to engaging in a business that comes within the terms of the Act, is it precluded from recovering on a contract made to carry out that business?

(Id. at p. 11.)  The Georgia Supreme Court has now entered judgment in response to the certified questions.  See San Miguel Produce, Inc., 843 S.E.2d at 405.

 The Georgia Supreme Court held "that an entity as described by the district court does qualify as a dealer in agricultural products under the Act" and "if a dealer has failed to obtain a license as required by OCGA § 2-9-2, it may not recover under a contract to the extent that the contract relates to business coming within the terms of the Act."  Id.  Business coming within the terms of the Georgia Dealers in Agricultural Products Act includes "buying, receiving, selling, exchanging, negotiating, or soliciting the sale, resale, exchange, or transfer of any agricultural products. . . ."  O.C.G.A. § 2-9-1(2).  San Miguel's activities easily fall within this expansive definition.  First, San Miguel negotiated the terms of the GSA in Georgia.  (Doc. 25, p. 2.)  In addition, under the GSA, San Miguel agreed to purchase produce from Herndon Farms which was delivered in Toombs County, Georgia.  (Doc. 66-2, p. 3.)  San Miguel also shipped produce from California to Toombs County.  (Doc. 63, p. 7.)

In light of the Georgia Supreme Court's holding, the Court finds that San Miguel cannot recover against Herndon Farms under the GSA because San Miguel did not have a Georgia Dealer in Agricultural Products license during any time relevant to this action.  Accordingly, the Court **GRANTS** Herndon Farms' Summary Judgment Motion as to San Miguel's Breach of GSA claim (Count I).[11]  (Doc. 61.)

---

[11]  San Miguel also brings an unjust enrichment claim based on Herndon Farms allegedly providing "incorrect amounts of [p]roduce" on their invoices to San Miguel.  (Doc. 1, p. 22.)  However, Georgia Courts have made clear that a party "cannot recover the value of goods and services provided under a theory of unjust enrichment . . . [i]f . . . an express agreement is unenforceable because it violates public policy . .

**B.      Herndon Farms is Entitled to Summary Judgment on San Miguel's Claim for Breach of the ROBO Operating Agreement.**

In Count II of its Complaint, San Miguel brings a breach of contract claim under the ROBO Operating Agreement.  (Doc. 1, pp. 17–18.)  Specifically, San Miguel explains that this claim is for funds San Miguel "advanced" to ROBO in 2014 and 2015 for operating expenses.  (Doc. 79, p. 15.) Herndon Farms argues that this agreement does not require it to cover San Miguel's loss for the funds San Miguel advanced to ROBO.  (Doc. 62, p. 16.)  In response, San Miguel argues that Herndon Farms has an "obligation to settle its negative capital account balance" under the ROBO Operating Agreement.  (Doc. 79, p. 15.)  Thus, this issue turns on determining the specific requirements imposed on Herndon Farms by the Operating Agreement.

Under Georgia law, "[t]he construction of a contract is a question of law for the court, and it is the cardinal rule of contract construction that the court should ascertain the intent of the parties." Davis v. VCP S., LLC, 740 S.E.2d 410, 411 (Ga. Ct. App. 2013) (citing O.C.G.A. §§ 13-2-1, 13-2-3).  However, "no construction is required or even permissible when the language employed by the parties in the contract is plain, unambiguous, and capable of only one reasonable interpretation." Walker v. Virtual Packaging, LLC, 493 S.E.2d 551, 554 (Ga. Ct. App. 1997) (quoting Bradley v. British Fitting Grp., PLC, 472 S.E.2d 146, 150 (Ga. Ct. App. 1996)).

Here, article seven of the Operating Agreement—titled "Dissolution and Winding Up"— states in part that "if the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the investment of any member, the member shall have no recourse against any other members for indemnification, contribution, or

---

. ."  JR Constr./Elec., LLC v. Ordner Constr. Co., 669 S.E.2d 224, 226 (Ga. Ct. App. 2008).  Accordingly, as San Miguel cannot enforce the GSA for its breach of contract claim, it likewise cannot bring a claim for unjust enrichment.  Thus, the Court **GRANTS** Herndon Farms' Motion for Summary Judgment as to San Miguel's unjust enrichment claim (Count VII).  (Doc. 61.)

reimbursement." (Doc. 66-3, pp. 11–12.) An investment is "[a]n expenditure to acquire property or assets to produce revenue [or] a capital outlay." Black's Law Dictionary (11th ed. 2019); cf. Golden Atlanta Site Dev., Inc. v. Nahai, 683 S.E.2d 166, 169–170 (Ga. Ct. App. 2009) (an agreement where a party pays in order to take part "in the financial return generated from" a common enterprise is "an investment" not a loan).

In his deposition, Nishimori, the principle owner of San Miguel, characterized the advancement to ROBO as an investment. (Doc. 66-14, p. 91.) Specifically, he stated that "San Miguel advanced money, [and] made payments for materials for ROBO Produce during 2015 expecting that the partnership in time or will, through profits, . . . be able to repay." (Id.) Thus, the undisputed evidence shows that San Miguel provided this money to ROBO with the expectation that it would be paid back through ROBO's profits. Clearly, this falls within the ordinary meaning of the term "investment" as described in article seven of the Operating Agreement. See, e.g., Milliken & Co. v. Ga. Power Co., 839 S.E.2d 306, 309 (Ga. Ct. App. 2020) ("In construing a contract so as [to] implement the intentions of the parties, a court is first required 'to look to the plain meaning of the words of the contract.'") (quoting Argo v. G–Tec Servs., LLC, 791 S.E.2d 193, 195 (Ga. Ct. App. 2016)).

In addition, under the section pertaining to profits and losses, the Operating Agreement states in part that "[t]he net profits or net losses of [ROBO], after providing for the expenses of [ROBO], shall be distributable or chargeable, as the case may be, to each of the members according to their pro rata interest in [ROBO] as determined with reference to their respective capital accounts." (Doc. 66-3, p. 7.) This section then provides a detailed process for how to handle ROBO's potential losses and notes that losses could be applied to a member's capital account if the member's income account was empty. (Id.) It further specifically notes that if a member's

capital account becomes "depleted by the debiting of losses, future profits allocable to that member shall not be credited to his or her income account until the depletion in his or her capital account shall have been made up, but shall be credited to his or her capital account."  (Id.)  Nowhere in this section does the Operating Agreement state that members must cover any losses themselves, even if their capital account is depleted.  As Georgia law makes clear, "a contract should be construed by examining the agreement in its entirety, and not merely by examining isolated clauses and provisions thereof."  Duffett v. E & W Props., Inc., 430 S.E.2d 858, 859 (Ga. Ct. App. 1993).  Thus, this section, read in combination with the "Profits and Losses" section, further supports the conclusion that the Operating Agreement does not require Herndon Farms to pay San Miguel for the advancements San Miguel made to ROBO.  San Miguel does not point to any specific language in the Operating Agreement to show that Herndon Farms had a definitive obligation to cover the advances San Miguel made to ROBO.   Accordingly, the Court **GRANTS** Herndon Farms' Summary Judgment Motion as to San Miguel's claim that Herndon Farms Breached the ROBO Operating Agreement (Count II).[12]  (Doc. 61.)

C.    **Herndon Farms is Not Entitled to Summary Judgment on San Miguel's PACA Misweighing Claim.**

In Count V of its Complaint, San Miguel asserts that Herndon Farms violated PACA by incorrectly weighing the produce it sent to ROBO, which resulted in San Miguel "overpa[ying] [Herndon Farms] . . . for goods actually delivered."  (Doc. 1, p. 20.)  In its Motion for Summary Judgment, Herndon Farms first argues that this claim fails because it is based on dealings that were

---

[12] In Count VII of its counterclaim, Herndon Farms brings an action for its "Lost Investment in [ROBO]." (Doc. 30, pp. 23–24.) San Miguel moved for summary judgment on this counterclaim arguing that that the ROBO did not require it to reimburse Herndon Farms for its lost investment.  (Doc. 66, pp. 13–14.)  As this Court has explained, the Operating Agreement places no obligation on either member of the ROBO to pay for the other member's lost investments in the ROBO.  Accordingly, the Court **GRANTS** San Miguel's Motion for Summary as to Count VII of Herndon Farms' counterclaim.  (Id.)

part of the GSA, which San Miguel cannot enforce.  (Doc. 62, pp. 5–8.)  It also argues this Count should be dismissed because San Miguel has not presented as evidence a USDA inspection certificate to prove any produce was underweight.  (Id. at pp. 16–20.)  In response, San Miguel asserts that it does not need a USDA inspection certificate in order to prevail on its PACA claim. (Doc. 79, pp. 18–21.)  The Court will address each of Herndon Farms' arguments in turn.

"PACA regulates the sale of perishable agricultural commodities to protect produce sellers from unscrupulous or insolvent dealers, brokers, and commission merchants."  Country Best v. Christopher Ranch, LLC, 361 F.3d 629, 631 (11th Cir. 2004) (per curiam).  Under PACA, it is unlawful for "any commission merchant, dealer, or broker to engage in or use any unfair, unreasonable, discriminatory, or deceptive practice in connection with the weighing . . . of any perishable agricultural commodity received, bought, sold, shipped, or handled in interstate or foreign commerce."[13]  7 U.S.C. § 499b(1).  "If any commission merchant, dealer, or broker violates any provision of section 499b of this title he shall be liable to the person or persons injured thereby for the full amount of damages . . . sustained in consequence of such violation."  Id. § 499e(a).

Herndon Farms first argues that San Miguel's PACA claim is derivative of its claim for breach of the GSA.  (Doc. 62, pp. 3, 5–8.)  It asserts then that because San Miguel cannot bring its GSA-based breach of contract claim (because San Miguel did not have a Georgia Dealer in Agricultural Products license, see Discussion Section II.A(2), supra), it likewise cannot bring a PACA claim based on the same transactions.  (Id.)  However, this argument ignores the plain language of PACA.  PACA provides a remedy to "person or persons injured" and does not limit

---

[13]  Neither party disputes that PACA is applicable to Herndon Farms.  In addition, the statute provides that "[a]ny person not considered as a 'dealer' under [previous clauses] may elect to secure a license under the provisions of section 499c of this title, and in such case and while the license is in effect such person shall be considered as a 'dealer'."  7 U.S.C. § 499a(b)(6).  Here, the evidence shows that Herndon Farms had a PACA license, (doc. 66-4, p. 6), and as such would qualify as a dealer under the statute.

recovery to only other merchants, dealers, and brokers, or those in a valid contractual relationship. 7 U.S.C. § 499e(a). Moreover, PACA explicitly states that it does "not in any way abridge or alter the remedies now existing at common law or by statute, and the provisions of this chapter are in addition to such remedies." 7 U.S.C. § 499e(b). The Eleventh Circuit has interpreted this language to mean that PACA remedies are "separate" from any state law remedies that a plaintiff might also assert. Paris Foods Corp. v. Foresite Foods, Inc., 278 F. App'x 873, 875 (11th Cir. 2008) (per curiam). Thus, San Miguel can bring its separate and distinct PACA claim even though its breach of contract claim fails.

San Miguel claims that Herndon Farms charged it for nearly 740,000 pounds of produce that Herndon Farms did not supply. In support, it points to discrepancies between the weights listed on Herndon Farms' invoices and the measurements taken at the ROBO facility. (Doc. 79-4, p. 14.) According to the record, workers at the ROBO facility measured the weight of delivered produce first using a table scale and, later, using a pallet scale. (Doc. 63, pp. 8–9; doc. 79-7, p. 6.) Herndon Farms argues that this evidence is insufficient for the PACA claim to survive summary judgment because San Miguel did not obtain a USDA inspection certificate to support the measurements taken by the ROBO employees. (Doc. 62, pp. 18–20.) In support of this argument, Herndon Farm first cites 7 U.S.C. § 499n. (Id.) Under that statute, "official inspection certificates for fresh fruits and vegetables issued by the Secretary of Agriculture pursuant to any law shall be received by all officers and all courts of the United States . . . as prima-facie evidence of the truth of the statements therein contained." 7 U.S.C. § 499n(a). While this statute makes clear that evidence bearing a USDA inspection certification should be considered prima facie evidence, it does not state that is the exclusive or necessary evidence of such facts or otherwise prohibit parties from relying upon and submitting other evidence. Herndon Farms cites no case law interpreting

the statute in a way that forecloses the Court from considering other evidence that it deems reliable and admissible, and this Court is not aware of any such authority.  For these reasons, this statute does not prevent the admission of San Miguel's evidence regarding weight of delivered produce.

Next, Herndon Farms points to a federal regulation issued by the USDA, which states in part:

> When produce is being handled for or on behalf of another person, proof as to the quantities of produce destroyed or dumped in excess of five percent of the shipment shall be provided by procuring an official certificate showing that the produce has no commercial value from any person authorized by the Department to inspect fruits and vegetables.

7 C.F.R. § 46.23.  As an initial matter, this regulation pertains specifically to produce that has been "destroyed or dumped," and nothing in the record indicates that San Miguel did this with any of the produce it received.  Moreover, the Court is aware of no authority that this regulation somehow creates an exclusive method of proof on a claim such as that brought by San Miguel.  Herndon Farms cites several USDA decisions in further support of its contention that this regulation prevents the consideration of San Miguel's evidence.  (Doc. 62, p. 19.)  However, in none of these cases does the USDA exclude or even discount evidence about the weight of produce just because the party did not have an inspection certificate.  The closest case Herndon Farms cites is Conner v. McBryde Produce, 69 Agric. Dec. 798 (Jan. 13, 2010).  In that case, Conner agreed to ship more than 40,000 pounds of watermelons to McBryde Produce.  Id. at 802.  McBryde Produce in turn sold all of the watermelons to a third party.  Id. at 803.  Conner sent the watermelons in a truck with one license plate number, and the third party eventually received watermelons from a truck with a different license plate number.  Id. at 802–03.  The third party claimed that it received 4,000 pounds fewer watermelons than what Conner agreed to sell to McBryde.  Id. at 803.  McBryde refused to pay Conner for the difference, and the case came before the USDA.  Id.  In examining

the evidence, the agency noted that there had been no USDA inspection but also stated there was "no other evidence in the case file to account for the 4,000 pound discrepancy in the weight of the watermelons." Id. at 803 n.1. Ultimately, the USDA found that McBryde failed to show that Conner had shipped too few watermelons. Id. at 819. However, it did not base its decision on the lack of an inspection certificate, but instead relied on the fact that the different license plates made it impossible "to conclude with reasonable certainty that the identity of the bins of watermelons [McBryde's] customer had weighed matche[d] the identity of the bins of watermelons [Conner] shipped on a different truck." Id. Thus, this case does not support Herndon Farms' assertion that San Miguel's evidence cannot be considered at all because of the lack of USDA certification.[14]

Here, San Miguel has provided evidence showing it paid for more produce than it received. (Doc. 79-4, p. 14.) This evidence creates a question of fact concerning how much produce San Miguel actually received, and it is for a jury to determine the credibility of this evidence. See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) ("It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment."). For these reasons, the Court **DENIES** Herndon Farms' Motion for Summary Judgment as to San Miguel's PACA Misweighing claim (Count V). (Doc. 61.)

---

[14] Even if one of the cited USDA decisions did interpret 7 C.F.R. § 46.23 to require a party to obtain certification in situations outside of dumping, the Court would not have to defer to it. The Supreme Court has articulated a standard for when a court should defer to an agency's interpretation of its own regulation, which is typically called "Auer deference." See Auer v. Robbins, 519 U.S. 452, 461–63 (1997). "Auer deference provides that when a regulation is ambiguous, [the court] defer[s] to the promulgating agency's interpretation of that regulation, unless its construction is plainly erroneous or inconsistent with the regulation[,] [a]s long as the agency's interpretation . . . reflect[s] [its] fair and considered judgment on the matter in question." United States v. Phifer, 909 F.3d 372, 382–83 (11th Cir. 2018) (sixth alteration in original) (internal quotation and citation omitted). Here, the at-issue regulation is not ambiguous. The text of the language refers only to "destroyed or dumped" produce, and the regulation itself is titled "Evidence of dumping." 7 C.F.R. § 46.23. Thus, the language is clear that the regulation only applies to dumping, and any interpretation expanding its scope to the evidence this Court may receive on a claim such as that brought here would clearly be inconsistent with the text and, as such, not entitled to deference.

**D.      Herndon Farms is Not Entitled to Summary Judgment on San Miguel's Negligent Misrepresentation Claim (Count VI).**

San Miguel also brings a state law negligent misrepresentation claim based on the same discrepancies between the produce weight listed on Herndon Farms' invoices and the produce weight recorded using the scales at the ROBO facility.  (Doc. 1, p. 22; doc. 79-4, p. 14.)  Herndon Farms argues that San Miguel's negligent misrepresentation claim should be dismissed because the claim is based on the GSA, which San Miguel cannot enforce, and because San Miguel's evidence is derived from scales that were not state certified.  (Doc. 62, pp. 3, 20–21.)  As an initial matter, Georgia case law is clear that a party can pursue a negligent misrepresentation claim even if the party cannot enforce a breach of contract claim based on the same set of facts.  See, e.g., Hendon Props., LLC v. Cinema Dev., LLC, 620 S.E.2d 644, 649–50 (Ga. Ct. App. 2005) ("[N]egligent misrepresentation, being a tort, presupposes the absence of an enforceable contractual relationship between the parties. Consequently, neither [plaintiff's] promissory estoppel claim nor its negligent misrepresentation claim is barred by the absence of a legally enforceable agreement between the parties.").  Accordingly, San Miguel's inability to assert a breach of contract claim under the GSA against Herndon Farms does not in itself cause its negligent misrepresentation claim to fail.

Herndon Farms next argues that San Miguel's misrepresentation claim fails because it used a pallet scale that was not approved by the Georgia Department of Agriculture to weigh the produce it received.  (Doc. 62, p. 21.)  Under Georgia law, the Commissioner of the Georgia Department of Agriculture shall "[i]nspect and test . . . weights and measures commercially used [i]n determining the weight, measure, or count of commodities or things sold, or offered or exposed for sale, on the basis of weight, measure, or count."  O.C.G.A. § 10-2-5(10)(A).  The Georgia Department of Agriculture can also promulgate regulations in order to enforce this law.  O.C.G.A.

28

§ 10-2-5(3).  One of these regulations states that "[i]f the new or used scale is installed by the buyer, or if the scale is relocated by the owner, the scale shall not be put into service prior to inspection by an inspector of the Weights and Measures Division."  Ga. Comp. R. & Regs. 40-15-2-.03(c)(1).

According to the record, the Georgia Department of Agriculture never inspected or approved any scale or weighing device for either ROBO or San Miguel between September 12, 2014 and December 7, 2016.  (Doc. 67-5, p. 3.)  Because of this, Herndon Farms argues that San Miguel is barred from bringing a claim using the measurements obtained from the unapproved scales.  (Doc. 62, pp. 20–21.)  In their response, San Miguel does not contest that the scales were uncertified but asserts that no Georgia authority exists to support Herndon Farms' contention that this bars its claim.  (Doc. 79, pp. 21–23.)  A review of the Georgia statutory scheme clearly shows that the penalty for failing to certify a scale is a "misdemeanor," O.C.G.A. § 10-2-22, and no statute indicates that weights obtained from the uncertified scale are prohibited from being used to support a claim for civil liability.  In addition, Herndon Farms cites no Georgia case law to support its contention that San Miguel's claim is barred because of the uncertified scales, and the Court has also been unable to find such support.

Finally, the out-of-state cases cited by Herndon Farms are less than persuasive.  First, in Smith Fertilizer & Grain Co. v. Wales, the Iowa Supreme Court stated that a party's failure to comply with a state statute concerning weighing could bar its breach of contract action.  Smith Fertilizer & Grain Co. v. Wales, 450 N.W.2d 814, 816 (Iowa 1990).  However, in that case, the statute specifically stated that "[n]o action shall be maintained in any of the courts of the state upon any contract or sale made in violation of or with the intent to violate" the weighing statute.  Id. at 814.  As the Court has already pointed out, no similar provision exists under Georgia law.  Herndon

Farms also cites <u>Petty v. Lyons</u>, 171 S.W. 112 (Ark. 1914), which is equally unpersuasive.  (Doc. 62, p. 21.)  In that more-than-a-century-old case, the plaintiff sought to collect a fee pursuant to a statute that "provide[d] that the cotton weigher or any deputy appointed shall receive as compensation for his services 10 cents for each bale of cotton weighed, to be paid by the purchaser."  <u>Petty</u>, 171 S.W. at 112.  However, because the plaintiff—a cotton weigher—had not tested his scales as required by law, the Court said he could not collect the statutory fee, reasoning that the law "certainly did not intend to permit him to weigh cotton and charge the fee provided for upon scales that were not properly tested and known to be correct."  <u>Id.</u> at 113.  The present case does not deal with any sort of special statutory fee for weighing produce but instead the common law tort of negligent misrepresentation.  Herndon Farms is thus unable to cite a case from any jurisdiction showing that a negligent misrepresentation claim should be barred for failure to properly certify scales.  As such, the Court **DENIES** Herndon Farms' Motion for Summary Judgment as to San Miguel's negligent misrepresentation claim for the allegedly misweighed produce (Count VI).  (Doc. 61.)

> **E.**    **Herndon Farms is Not Entitled to Summary Judgment on San Miguel's Claim for Attorney's Fees.**

San Miguel requests attorney's fees pursuant to O.C.G.A. § 13-6-11.  (Doc. 1, p. 22.) Under this code section, which authorizes plaintiffs to recover expenses of litigation where the defendant has acted in bad faith or been stubbornly litigious, a plaintiff "must prevail on [its] basic cause of action in order to obtain litigation expenses."  <u>Ellis v. Gallof</u>, 469 S.E.2d 288, 289 (Ga. Ct. App. 1996) (quoting <u>Barnett v. Morrow</u>, 396 S.E.2d 11, 13 (Ga. Ct. App. 1990)).  Herndon Farms asserts San Miguel may not obtain attorney's fees provided for in O.C.G.A. § 13-6-11 because San Miguel's claims fail in whole.  (Doc. 62, p. 22.)  However, because the Court has determined that Herndon Farms is not entitled to summary judgment on all of San Miguel's claims,

it is not entitled to summary judgment on the claim for attorney's fees.  See R.T. Patterson Funeral Home v. Head, 451 S.E.2d 812, 819 (Ga. Ct. App. 1994) (plaintiff may recover attorney's fees attributable to claims on which it prevails).

Accordingly, the Court **DENIES** this portion of Herndon Farms' Motion for Partial Summary Judgment.  (Doc. 61.)  San Miguel may pursue attorney's fees at trial on those claims which remain before the Court.

### F.       Herndon Farms is Not Entitled to Summary Judgment on Its Unpaid Invoice Counterclaims.

Herndon Farms also seeks summary judgment on two of its counterclaims.  (Doc. 62, pp. 22–24.)  Herndon Farms asserts both a breach of contract counterclaim and a failure to account and pay properly counterclaim against San Miguel (Counts I and III).  (Doc. 30, pp. 17–18, 20–21.)  These counterclaims are based on Herndon Farms' argument that it sent San Miguel invoices totaling $486,095.83, and San Miguel did not timely object to them.  (Doc. 62, pp. 22–23.)  It further argues that the GSA is completely unenforceable, so these invoices should act as the operative contract between the two parties, and that San Miguel violated the invoices by not paying.  (Id. at pp. 23–24.)  In response, San Miguel first argues that the GSA is still a valid agreement which governs their transactions.  (Doc. 79, p. 24.)  It also asserts that Herndon Farms' argument that the invoices can serve as an enforceable contract is based on an incorrect reading of Georgia law.  (Id. at pp. 24–25.)  The Court agrees with San Miguel for the following reasons.

### (1)       The GSA is still valid as to Herndon Farms' Counterclaims.

First, the fact that San Miguel may not recover under the GSA (due to its own failure to obtain a license as required by O.C.G.A. § 2-9-2) does not mean that the GSA is itself invalid.  Herndon Farms has not cited any authority to support this theory.  Moreover, Georgia law is clear that "[c]ontracts void as against public policy or merely legally unenforceable 'may be severable

31

so that the entire contract not be void but merely unenforceable as to that which is illegal.'" Bowers v. Howell, 417 S.E.2d 392, 394 (Ga. Ct. App. 1992) (quoting Johnson v. Frazier, 173 S.E.2d 434, 436 (Ga. Ct. App. 1970)).  The GSA itself states "[i]f any term of this Agreement is held by a court of competent jurisdiction to be void or unenforceable, the remainder of the contract terms shall remain in full force and effect and shall not be affected."  (Doc. 66-2, p. 12.)  Thus, despite San Miguel's inability to recover for any breach of it, the GSA and its terms remain valid.

Herndon Farms next argues that the GSA is void because the contract lacks a mutuality of consideration.  (Doc. 62, pp. 12–14.)  "To constitute consideration, a performance or a return promise must be bargained for by the parties to a contract."  O.C.G.A § 13-3-42(a); see also O.C.G.A § 13-3-42(b) ("A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise.").  Herndon Farms argues that, because the GSA did not require San Miguel to purchase a minimum amount of produce from it or to purchase exclusively from it, the contract fails.  (Doc. 62, pp. 12–14.)  In support, Herndon Farms cites Billings Cottonseed, Inc. v. Albany Oil Mill, Inc., 328 S.E.2d 426 (Ga. Ct. App. 1985).  In that case, the seller agreed to sell seeds in an amount "sufficient to meet all reasonable requirements of" the buyer, but the buyer only had "to purchase from [the seller], seed which, from time to time, it reasonably required."  Billings Cottonseed, 328 S.E.2d at 428.  The Georgia Court of Appeals found no mutuality of consideration because "there [was] no promise, express or implied, by [the buyer] to purchase its requirements exclusively from [the seller]."  Id. at 429.

San Miguel argues that the facts of this case differ from Billings Cottonseed because it had additional obligations under the GSA, besides buying produce, which would create consideration. (Doc. 79, pp. 11–13.)  San Miguel points to a section of the GSA which required it to "[m]anage

all sales and marketing of packaged fresh-cut products" and "[p]rovide sales and marketing opportunities for Grower's bunch/bulk product sales."[15]  (Doc. 66-2, p. 4.)  The Court finds that these promises are adequate to establish consideration.  See Franklin v. UAP/GA. AG. CHEM, Inc., 514 S.E.2d 241, 243 (Ga. Ct. App. 1999) ("Slight consideration is sufficient to sustain a contract.") (citing Wolfe v. Breman, 26 S.E.2d 633, 635 (Ga. Ct. App. 1943)).  Because San Miguel had an obligation with regard to the produce that Herndon Farms delivered (and the delivered produce is the subject of this breach of contract claim), the contract does not fail for lack of mutuality of consideration.  See Sealtest S. Dairies Div. v. Evans, 120 S.E.2d 887, 890 (Ga. Ct. App. 1961) ("[A]s to the past performance, an action would lie, but not for a breach as to the future performance . . . .  While the contract was unilateral and, therefore, unenforceable as to future performances, the plaintiff clearly is entitled to recover for deliveries made under the contract prior to the plaintiff's refusal to make future deliveries."); Romala Stone, Inc. v. Home Depot U.S.A., Inc., No. 1:04–CV–02307–RWS, 2009 WL 900776, at *7 (N.D. Ga. Mar. 30, 2009) (contract was unenforceable for unperformed portions but was enforceable to the extent that one party had already delivered goods because the other party then had an obligation to "promote and market" those goods).

Herndon Farms also argues that the GSA fails because the quantity term in the contract is indefinite.  (Doc. 62, pp. 10–11.)  Under the GSA, Herndon Farms had to "make a good faith effort

---

[15] Somewhat confusingly, a different part of the GSA states that "[i]n no event is this Agreement to be deemed or construed as a guarantee or warranty of any specific price, marketing, or distribution . . . ." (Doc. 66-2, p. 7.)  This provision is within a section of the GSA titled "Marketing," which also states that San Miguel "shall have the exclusive right to . . . market, and sell the Crops under its own labels, or under such other labels as it may choose." (Id.)  Reading these two provisions together, the GSA apparently required San Miguel to manage marketing and provide marketing opportunities but did not require San Miguel to market the Crops in a specific way or under specific labels.  This interpretation of the GSA allows all the discussed provisions of the GSA to stand, which is consistent with the rules of contract interpretation under Georgia law.  See Eckerd Corp. v. Alterman Props., Ltd., 589 S.E.2d 660, 665 (Ga. Ct. App. 2003) ("[A] contract must be construed so as to reconcile its different provisions and to avoid an interpretation which renders any portion meaningless.").

to grow [c]rops in sufficient quantity to meet the anticipated volume of orders set forth in Addendum A, attached." (Doc. 66-2, p. 3.) Likewise, San Miguel had to "[p]urchase from [Herndon Farms] the Crops set forth in Addendum A." (Id.) Addendum A then lists three types of crops, but under "Quantity," it simply states, "Schedule Attached." (Id. at p. 13.) Apparently, however, no schedule was attached. Herndon Farms argues that since no schedule setting forth the quantities was attached, there is no contract. (Doc. 62, pp. 10–12.) In its Response, San Miguel points to Jason Herndon's deposition testimony where he describes receiving schedules and projections of pounds needed from San Miguel.[16] (Doc. 79, pp. 10–11.) According to that testimony, Jason Herndon first received "schedules for field pounds needed" on July 2, 2014, and Herndon Farms then started planting "[s]ome time in July." (Doc. 66-11, p. 24.) Jason Herndon further stated that, during their business relationship, San Miguel sent "projections, numerous projections of what product they thought they needed," and then he would "figure out . . . [how] to produce that volume to suffice [San Miguel's] needs." (Id. at p. 10.) Finally, Jason Herndon noted that the projections included "pounds needed." (Id.) San Miguel argues that this testimony is evidence of San Miguel and Herndon Farms' course of dealing, which can be used to determine the quantity term. (Doc. 79, pp. 9–11.) In response to this, Herndon Farms argues that, at best, this is only evidence of an agreement to agree, which would still make the GSA unenforceable. (Doc. 62, pp. 14–15.)

Under Georgia law, "[a] contract cannot be enforced if its terms are incomplete, vague, indefinite, or uncertain." Douglas Asphalt Co. v. Martin Marietta Aggregates, 793 S.E.2d 615, 617 (Ga. Ct. App. 2016) (quoting Burns v. Dees, 557 S.E.2d 32, 35 (Ga Ct. App. 2001)). "A

---

[16] Jason Herndon is Bo Herndon's nephew. (Doc. 66-11, p. 14.) He is the "farm manager" at Herndon Farms and his duties include "mak[ing] sure production is done" on the farm and that the produced is shipped off the farm. (Id. at p. 4.)

promise must be sufficiently definite as to both time and subject matter to be enforceable." Key v. Naylor, Inc., 602 S.E.2d 192, 195 (Ga. Ct. App. 2004). "If a contract fails to establish an essential term, and leaves the settling of that term to be agreed upon later by the parties to the contract, the contract is deemed an unenforceable 'agreement to agree.'" Kreimer v. Kreimer, 552 S.E.2d 826, 829 (Ga. 2001). However, "[t]he law does not favor destroying contracts on the basis of uncertainty, and a contract that may originally have been indefinite may later acquire more precision and become enforceable because of the subsequent words or actions of the parties." Sanders v. Commercial Cas. Ins. Co., 485 S.E.2d 264, 267 (Ga. Ct. App. 1997). "A course of performance or course of dealing between the parties . . . may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement." O.C.G.A. § 11-1-303(d). The Court of Appeals of Georgia decision in Scovill Fasteners, Inc. v. Northern Metals, Inc., 692 S.E.2d 840 (Ga. Ct. App. 2010), is particularly instructive on this issue.

In that case, "the evidence showed that to execute the contract, [the buyer] issued blanket purchase orders containing specifications for material but no amounts or actual delivery dates. Then, on an as-needed basis, [the buyer] would issue [the seller] 'releases' that specified how much of what material was needed." Scovill Fasteners, Inc, 692 S.E.2d at 842. The seller would rely on these releases to make sure it would have enough material to supply to the buyer. Id. Both parties eventually filed breach of contract claims against each other. Id. at 841. The trial court ruled that "the parties' actual agreement was not contained in any one document" and it instead examined the "subsequent verbal negotiations between the parties, the initial purchase orders sent by [the buyer] to [the seller], and the running annual usage document and the stock requirements documents provided via email from [the buyer] to [the seller]." Id. at 843. The Georgia Court of Appeals held that "the trial court correctly considered matters outside the [initial agreement] to

determine the parties' intended final obligations under the agreement" and further stated that, "[i]n light of this lack of clarity [in the initial agreement], the trial court did not err in considering the parties' behavior and their courses of performance and dealing, including that [the seller] relied on the promised three-month forecast to stock material sufficient to meet the delivery deadlines." Id.

Like the buyer in Scovill Fasteners, San Miguel sent Jason Herndon projections of the amount of crops it needed throughout the parties' business relationship. (Doc. 66-11, pp. 10, 24.) Herndon Farms then relied on these projections to prepare crops for San Miguel, just like the seller in Scovill Fasteners. (Id.) Thus, San Miguel's projections can be used—just as the releases in Scovill Fasteners were used—to define the quantity term in the agreement between San Miguel and Herndon Farms. Accordingly, the GSA does not fail for indefiniteness. Furthermore, the Scovill Fasteners Court did not consider the contract to be an unenforceable "agreement to agree" even though the buyer sent releases after the initial agreement that specified the amount of material needed. Thus, guided by Scovill Fasteners and Georgia law's policy against invalidating contracts, the Court also finds that the GSA is not an unenforceable agreement to agree. See Miami Heights LT, LLC v. Home Depot U.S.A., Inc., 643 S.E.2d 1, 4 (Ga. Ct. App. 2007) ("[T]he policy of the law is against the destruction of contracts on the ground of uncertainty if it is possible in the light of the circumstances under which the contract was made to determine the reasonable intention of the parties.") (citation omitted).

### (2) Herndon Farms' invoices are not valid contracts.

Finally, even if the GSA was completely invalid, Herndon Farms would still not be entitled to summary judgment because Georgia law does not consider invoices to be contracts in this context. Herndon Farms argues that the invoices it sent San Miguel totaling $486,095.83 constitute a valid contract because San Miguel did not reject the invoices within ten days. (Doc. 62, p. 23.)

36

It cites <u>Ready Trucking, Inc. v. BP Exploration & Oil Co.</u>, 548 S.E.2d 420 (Ga. Ct. App. 2001), to support this contention.[17]   (<u>Id.</u>)  In that case, Ready Trucking regularly purchased diesel fuel from BP.  <u>Ready Trucking, Inc.</u>, 548 S.E.2d at 422.  After each purchase, BP sent Ready Trucking an invoice which listed the price but also stated that BP was not withholding both state and local sales taxes.  <u>Id.</u>  After the Georgia Department of Revenue billed Ready Trucking for several thousand dollars in back taxes, Ready Trucking sued BP for breach of contract, arguing that BP had agreed to a purchase price that included all applicable taxes.  <u>Id.</u>  The Court found in favor of BP reasoning that "[t]he invoices constitute[d] an enforceable writing confirming the terms of the agreement, and they constitute[d] an agreement between the parties that the two missing taxes would not be collected and remitted by BP."  <u>Id.</u> at 424.

While <u>Ready Trucking</u> has never been overturned, a more recent Georgia case indicates that <u>Ready Trucking</u> should not be extended beyond its facts.  In <u>Wheeler v. IDN-Armstrong's, Inc.</u>, a supplier of goods brought a claim against a buyer alleging that the buyer had not paid it.  <u>Wheeler v. IDN-Armstrong's, Inc.</u>, 653 S.E.2d 835, 836 (Ga. Ct. App. 2007).  The buyer provided evidence that it had paid in the form of invoices marked as "paid."  <u>Id.</u>  The trial court found this evidence unpersuasive and entered judgment in favor of the supplier.  <u>Id.</u>  The Georgia Court of Appeals upheld the decision, stating that "under Georgia law an invoice for goods delivered on open account is not a contract or similar legal document that defines rights, duties, entitlements,

---

[17]  Herndon Farms also cites <u>Imex International, Inc. v. Wires EL</u>, 583 S.E.2d 117 (Ga. Ct. App. 2003), to support its argument that the invoices serve as valid contracts.  (Doc. 62, p. 23.)  In that case, the plaintiff brought an open account action against the defendant after the defendant did not fully pay the amount stated in the invoice.  <u>Imex Int'l, Inc.</u>, 583 S.E.2d at 120.  The Georgia Court of Appeals found for the plaintiff.  <u>Id.</u> at 119.  In doing so, it stated that a plaintiff establishes a prima facie open account case when it tenders into evidence an "authenticated invoice" that "is supported by testimony that the invoiced amount was unpaid."  <u>Id.</u> at 121.  However, the court also noted that granting summary judgment on such a claim is inappropriate "when there exists a bona fide dispute as to the amount due or the receipt of goods . . . ."  <u>Id.</u>  As this Court has already discussed, San Miguel disputes the amount of produce it received from Herndon Farms.  <u>See</u> Discussion Section II.C, <u>supra</u>.  Accordingly, the Court finds that <u>Imex Int'l, Inc.</u> does not support Herndon Farms' contention that its invoices are valid contracts.

or liabilities. An invoice is 'a mere detailed statement of the nature, quantity, and cost or price of the things invoiced.'" Id. at 837 (quoting H. E. Lupo & Co. v. Brown-Wright Hotel Supply Corp., 108 S.E.2d 767, 769 (Ga. Ct. App. 1959)). While Wheeler dealt with the application of the parol evidence rule, the Court finds that its reasoning casts considerable doubt upon the reach of Ready Trucking.[18] Accordingly, the Court finds that Georgia case law, on balance, does not support Herndon Farms' argument that the invoices it sent San Miguel are binding contracts.

For all the above reasons, the Court **DENIES** Herndon Farms' Motion for Summary Judgment as to its breach of contract and failure to account and pay counterclaims (Counts I and III). (Doc. 61.)

### III.   San Miguel's Motion for Partial Summary Judgment (Doc. 66)

San Miguel also moves for summary judgment on several of Herndon Farms' counterclaims. (See doc. 66.) First, San Miguel seeks summary judgment on Herndon Farms' counterclaim for attorney's fees, arguing that the GSA prevents Herndon Farms from recovering such fees. (Id. at pp. 4–5.) San Miguel also seeks partial summary judgment on Herndon Farms' breach of contract counterclaim (Count I). (Id. at pp. 14–15.) It argues that Herndon Farms unilaterally increased the price of produce, and San Miguel is not obligated to pay that price. (Id.) The Court will address each of these arguments in turn.

#### A.   San Miguel is Entitled to Summary Judgment on Herndon Farms' Counterclaims for Attorney's Fees.

Herndon Farms seeks attorney's fees as part of Counts I and III of its counterclaim. (Doc. 30, pp. 18, 21.) San Miguel argues that Herndon Farms cannot receive attorney's fees because it

---

[18] The Court finds further cause for doubt in reading prior district court decisions that have critiqued Ready Trucking. See ABV Elecs., Inc. v. Ceton Corp., No. 1:12-CV-2178-ODE, 2014 WL 12573015, at *5 (N.D. Ga. Mar. 25, 2014) ("The holding of Ready Trucking has been criticized by commentators . . . ."); Ardus Med., Inc. v. Emanuel Cty. Hosp. Auth., 558 F. Supp. 2d 1301, 1310 (S.D. Ga. 2008) (applying Ready Trucking but noting that the "holding has been criticized").

has violated the terms of the GSA.  (Doc. 66, pp. 4–5.)  Specifically, it points to a provision of the GSA which stated that San Miguel and Herndon Farms "agree to mediate any dispute or claim arising out of this Agreement before resorting to any legal action."  (Doc. 66-2, p. 6.)  The provision further provided that if either party "commences legal action without first attempting to resolve the matter through meditation . . . then that party shall not be entitled to recover attorney's fees, even if attorney's fees would otherwise be available to that party . . . ."  (Id.)  San Miguel asserts that Herndon Farms commenced a legal action before attempting mediation when it filed an informal PACA claim with the USDA.  (Doc. 66, p. 5; doc. 66-4, pp. 5–7.)  Because of this, San Miguel argues that Herndon Farms is not entitled to attorney's fees.  (Doc. 66, p. 5.)  In response, Herndon Farms argues that this provision of the GSA is unenforceable.  (Doc. 76, pp. 2–3.)  It also argues that it initiated a mediation process with the USDA and not a legal action, so it did not violate the GSA even if the GSA is valid.  (Id. at pp. 3–6.)

In Georgia, "[t]here is no general public policy against contracting for the recovery of attorney's fees."  Hope & Assocs., Inc. v. Marvin M. Black Co., 422 S.E.2d 918, 919 (Ga. Ct. App. 1992).  The Court has already determined that the GSA is itself enforceable, though San Miguel is not permitted to recover on a breach of contract claim pursuant to it.  See Discussion Section II.F, supra.  Thus, Herndon Farms' ability to collect attorney's fees turns on whether the claim it filed with the USDA constituted a legal action or a mediation.  Herndon Farms has already argued that its informal PACA complaint only constituted a request for mediation earlier in this action, when it asserted it had not waived its right to enforce the GSA forum-selection clause.  (See doc. 22, p. 7 n.5.)  At that time, the Court found that "nothing in the record indicates that Herndon ever intended to pursue mediation through the USDA."  (Id.)  The Court finds nothing in Herndon Farms' more recent filings provides a basis for reconsidering this conclusion.

Herndon Farms cites footnotes from two USDA decisions to support its argument that it only sought mediation of its claims when it filed the informal PACA Complaint.  (Doc. 76, p. 4 (citing Lake Erie Greenhouse Mgmt. & Leasing Corp. Operating as Clifton Produce v. Agristar Produce LLC, 59 Agric. Dec. 878 (2000) and Trans-W. Fruit Co., Inc. v. Ameri-Cal Produce, Inc., 42 Agric. Dec. 1955 (1983)).)  In Trans-W. Fruit, the USDA addressed whether a party that had filed a compulsory counterclaim in state court was prevented from instituting a PACA claim (based on the same transactions involving the same parties) with the USDA.  Trans-W. Fruit Co., Inc., 42 Agric. Dec. at 1955–58.  The USDA, in its "Decision and Order," concluded it was not so precluded, and in a footnote it explained that instituting an informal PACA action with the USDA does not count as an "action" for purposes of the federal statute prohibiting a party from maintaining an action with both the USDA and a court of competent jurisdiction.  Id. at 1957 n.2.  The USDA reiterated this position in a subsequent decision, stating that "[a] PACA reparation action qualifies as 'another pending action'. . . only if a formal complaint has been filed.  A pending informal complaint is not viewed as commencing an 'action.'"  Lake Erie Greenhouse Mgmt. & Leasing Corp., 59 Agric. Dec. at 882 n.5 (citing Trans-W. Fruit, 42 Agric. Dec. at 1957 n.2).  Both of these cases dealt with an issue entirely unrelated to the present issue of whether informal PACA complaints constitute requests for mediation, and thus provide no indication that the USDA would view them as such.

The Court's skepticism over the applicability of these two cases is further enhanced given the fact that evidence shows that the USDA declined Herndon Farms' informal PACA complaint specifically *because* the GSA required the parties to mediate.  See Exhibit A at 20, L.G. Herndon Farms Jr., Inc. v. San Miguel Produce, Inc., 6:16-cv-43 (S.D. Ga. Apr. 12, 2016), ECF No. 15-1.  It is undisputed that the USDA sent Herndon Farms a letter stating that it could not "open [Herndon

Farms'] complaint because [Herndon Farms] elected to go before mediation based on item 7 of the [GSA] . . . ." (<u>Id.</u>)  The USDA then concluded the letter by explaining that "it appears the parties made an election outside of the PACA for resolution of disputes thereby prohibiting us from entertaining this matter." (<u>Id.</u>)  It is clear from this letter that the USDA did not consider Herndon Farms' informal PACA complaint to be a request for mediation.  Thus, for these reasons and the reasons the Court gave in its previous order, (doc. 22, p. 7 n.5), the undisputed facts, even when viewed in the light most favorable to Herndon Farms, establish that Herndon Farms did not commence mediation when it filed an informal PACA complaint and that it thus violated the GSA by initiating a legal action.  Accordingly, the Court **GRANTS** San Miguel's Motion for Summary Judgment as to Herndon Farms' requests for attorney's fees in Counts I and III of its Counterclaim. (Doc. 66.)

> **B.    San Miguel is Entitled to Partial Summary Judgment on Herndon Farms' Breach of Contract Counterclaim (Count I) to the extent it is based on Herndon Farms Increasing Prices.**

San Miguel also seeks partial summary judgment on Herndon Farms' breach of contract counterclaim (Count I) to the extent that its counterclaim for $486,095.83 is based on Herndon Farms raising the price of greens by $0.10 per pound in January 2016.  (Doc. 66, pp. 14–15.)  San Miguel argues that the price increase violates the GSA and is unenforceable.  (<u>Id.</u> at p. 15.)  In response, Herndon Farms argues that it notified San Miguel that it was increasing prices.  (Doc. 76, pp. 9–10.)  It also once again contends that the entire GSA is unenforceable and that the invoices it sent to San Miguel now govern the transaction.  (<u>Id.</u> at pp. 10–12.)

As an initial matter, the Court has already determined that the GSA is enforceable as to Herndon Farms' breach of contract counterclaim and thus is the document which governs this dispute.  <u>See</u> Discussion Section II.F, <u>supra</u>.  According to the GSA, the parties intended for the

contract to "be for five (5) years commencing on the 1st day of November, 2014." (Doc. 66-2, p. 2.) In addition, Addendum A, titled "Production Requirements By Crop, Quantity, And Price Crop Year 2014–2015," set the price for "Fresh Cut Greens–Conventional" at "$[0].30 per Field Lb." and the price for "Fresh Cut Greens–Organic" at "$[0].40 per Field Lb." (Id. at p. 13.)

Herndon Farms asserts that the Addendum concerned only the 2014–2015 crop year and did not address prices for years after 2015. (Doc. 76, p. 9.) It also points to a chain of emails exchanged between Bo Herndon and Roy Nishimori where Mr. Herndon discussed increasing prices. (Docs. 76-2, 76-3, 76-4, 76-5.) In one of the emails, Mr. Nishimori offered to submit a proposal for "developing new subsequent agreements for 2016" and offered to pay $0.36 per pound for "Conventional" product and $0.58 per pound for "Organic" product. (Doc. 76-4, pp. 2–3.) In subsequent emails, Mr. Herndon said he could not agree to the organic produce price, (doc 76-4, p. 2), and offered to grow the "greens" for $0.40 per pound, (doc. 76-5, p. 2). In addition, Mr. Herndon testified in his deposition that, in November or December 2015, he informed San Miguel that Herndon Farms intended to increase prices in January. (Doc. 66-12, p. 30.) According to Mr. Herndon, San Miguel "agreed" to a price increase but, he admitted, "none of that was in writing." (Id.) Thereafter, Herndon Farms increased prices from $0.30 per pound to $0.40 per pound. (Id.) Based on this evidence, Herndon Farms argues that San Miguel had notice of the price increase. (Doc. 76, p. 9.)

While Herndon Farms is correct that Addendum A only specifically mentions the 2014–2015 crop year, it is also clear that the GSA was intended to govern Herndon Farms and San Miguel's transactions for five years starting in November 2014. (Doc. 66-2, pp. 2, 13.) The Addendum must be read in the context of the rest of the contract. See Thornton v. Kumar, 525 S.E.2d 735, 736 (Ga. Ct. App. 1999) ("[T]he whole contract should be looked to in arriving at the

construction of any part."). Section 2 of the GSA, titled "Grower's Responsibilities," states in part that "prices as described in Addendum A, attached, . . . may be modified in writing by the Parties from time to time during the term of this Agreement." (Doc. 66-2, p. 2.) Furthermore, the GSA also explicitly provides that "[n]o change or modifications of this Agreement shall be valid unless the same shall be in writing and signed by both parties hereto." (Id. at p. 10.) Herndon Farms has not shown (and, according to Mr. Herndon's testimony, cannot show) that it and San Miguel signed a written agreement increasing the price of greens from $0.30 to $0.40.[19] Because there is no evidence of a written agreement, the Court **GRANTS** San Miguel's Motion for Partial Summary Judgment as to Count I of Herndon Farms' counterclaim to the extent that Herndon Farms seeks payment based on its increased prices. (Doc. 66.)

## CONCLUSION

Based on the foregoing, the Court **GRANTS IN PART** and **DENIES IN PART** L.G. Herndon Jr. Farms, Inc.'s Motion for Partial Summary Judgment. (Doc. 61.) Accordingly, the Court **DISMISSES** Counts I, II, III, IV, and VII of San Miguel's Complaint. (Doc. 1, pp. 15–20, 22.) Counts V, VI, and VIII of San Miguel's Complaint remain pending against Herndon Farms. (Id. at pp. 20–22.) The Court also **DENIES** Herndon Farms' Motion for Partial Summary Judgment as to Counts I and III of its own Counterclaim. (Doc. 61.) In addition, the Court **GRANTS** San Miguel Produce, Inc.'s Motion for Partial Summary Judgment. (Doc. 66.) The Court **DISMISSES** Count I of Herndon Farms' Counterclaim to the extent it is based on Herndon Farms' increase of its prices. (Doc. 30, p. 17–18.) The Court also **DISMISSES** Counts II, IV, VI, VII, VIII, and IX of Herndon Farms' Counterclaim as well as Herndon Farms' claims

---

[19] Herndon Farms once again argues that the invoices it sent San Miguel—not the GSA—should serve as the contract between the two parties. (Doc. 76, pp. 10–12.) As previously explained, the Court does not find this contention consistent with Georgia case law. See Discussion Section II.F, supra.

for attorney's fees.  (Id. at pp. 18–20, 21, 23–25.)  Herndon Farms' remaining counterclaims

(Counts I, III, and V) remain pending against San Miguel.  (Id. at pp. 17–18, 20–22.)

Accordingly, the Court **DIRECTS** the Clerk of Court to **TERMINATE** Roy Nishimori and

Janis Berk as parties to this action as no claims remain pending against these parties.  Finally, the

Court **ORDERS** Herndon Farms' to file its written submissions, as set forth in footnote 2, supra,

**within fourteen (14) days** of the date of this Order.

      **SO ORDERED**, this 10th day of December, 2020.

_____
R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA